# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RAYMOND C. FOBBS #130215** | : | **CIVIL ACTION** |
| | : | **NUMBER: 11-700-BAJ-SCR** |
| **VERSUS** | | |
| | : | **JUDGE JACKSON** |
| **DANIEL DAVIS, ET AL.** | : | **MAGISTRATE RIEDLINGER** |

**STATE OF LOUISIANA**
**PARISH OF OUACHITA**

## AFFIDAVIT

**BEFORE ME**, the undersigned Notary, personally came and appeared:

## DR. TOBE MOMAH

the undersigned affiant, having first been duly sworn, did depose and state under oath the following:

1.

I am licensed to practice medicine in the State of Louisiana.

2.

I worked as a staff physician at Louisiana State Penitentiary in Angola, Louisiana (LSP) from April 2011 – February 2012.

3.

I am currently employed as a family practice physician at Primary Health Service Center in West Monroe, Louisiana.

4.

I have reviewed the claims asserted by inmate Raymond Fobbs DOC# 130215 in suit number USM-11-700, wherein he alleges I was deliberately indifferent to his medical needs and that I conspired with unidentified DOC officials to render inadequate medical treatment to him on August 21, 2011.

5.



STATE'S EXHIBIT
I
Blumberg No. 5138

1

Plaintiff's medical records from August 21, 2011 show that he was brought to the Assessment and Treatment Unit ("ATU") at approximately 3:30 p.m. after being involved in a confrontation.

6.

Inmate Fobbs was short of breath when he came to the ATU. The E.M.T. administered oxygen and Albuterol upon arrival. Albuterol is used to treat asthma exacerbation. The E.M.T. also documented injuries that were noted on plaintiff's body on the body chart.

7.

Plaintiff complained of shortness of breath secondary to spray following an incident. My responsibility to plaintiff was to first and foremost relieve him of the difficulty he was having breathing when he arrived at the ATU.

8.

Inmate Fobbs was wheezing when I listened to his breathing with a stethoscope. 1 liter of saline, which is an IV fluid, was administered to help him breathe, along with 250 milligrams of Solu-Medrol, a steroid, to help clear his lungs. Oxygen continued to be administered to him.

9.

Inmate Fobbs' heart rate was irregular upon examination. His blood pressure was almost 200, which is very high, when I treated him. I gave him Clonidine, which is a blood pressure pill and continued to monitor him.

10.

I physically examined plaintiff. He had contusions with bruising, swelling and no broken skin on his shoulders and on his left wrist with no break in the skin.

11.

Plaintiff lost part of his great toenail. The wound was noted as superficial. Plaintiff was to receive dry dressing for the foot and any of the other injuries.

12.

X-rays were taken of plaintiff's chest and right foot. The x-rays revealed no chest infection and plaintiff's foot was negative for a fracture.

13.

2

I don't recall whether plaintiff told me he wanted pain medicine. However, I would not have approved his request by prescribing aggressive pain medicines like Toradol, Meloxiam, Naproxsen or Ibuprofen because those drugs would have elevated his blood pressure.

14.

I prescribed Tylenol for pain and Prednisone, another steroid, which he was to take over the course of 5-10 days for asthma exacerbation.

15.

Tylenol is the only medicine that would not make his blood pressure increase.

16.

The treatments that were administered to plaintiff were successful. His lungs were clear upon re-check at 5:40 p.m.

17.

The plaintiff's medical condition was properly treated, and based upon my medical training, I provided more than adequate medical treatment to the plaintiff on August 21, 2011. Stated differently, I was not deliberately indifferent to inmate Fobbs' medical needs nor did I conspire with DOC officials to render inadequate medical treatment to him on the aforementioned date.

18.

In addition to plaintiff, I also saw John Sanders, who complained of bruising on both arms, when he came to the infirmary on August 21, 2011.

19.

John Sanders' medical record indicates that he had a bruise on the inside of his right wrist that was approximately 4 centimeters. He also had a scratch that was approximately 4 centimeters with no swelling noted on the inside of his left wrist. The record indicates the bleeding was controlled and that Sanders refused medical treatment.

The above facts are true and correct to the best of my knowledge, information and belief under penalty of perjury.

_____
WITNESS

_____
WITNESS

_____
TOBE MOMAH, M.D.

3

SWORN TO AND SUBSCRIBED before me, this _3rd_ day of

_December_, 2012, at Monroe, Louisiana.

_[signature]_

NOTARY

NAME _J. Albert Ellis_

BAR ROLL NUMBER _18592_

ADDRESS _130 DeSiard St, Suite 812_

_Monroe, LA 71201_

_Commission Expires at Death_

4

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


\* \* \* \* \* \* \* \* \* \* \* \* \*
                              \*
RAYMOND C. FOBBS              \*    CIVIL ACTION
                              \*    NO. 11-700
versus                        \*
                              \*
DANIEL DAVIS, ET AL           \*    POLOZOLA/DALBY
                              \*
\* \* \* \* \* \* \* \* \* \* \* \* \*


The testimony of **TOBE SAMUEL MOMAH,
M.D.**, taken by the plaintiff pursuant to
notice and the within stipulation at the
Louisiana State Penitentiary, 17544 Tunica
Trace, Angola, Louisiana, beginning at
11:35 a.m. on October 26, 2012.


Before Mark LaCour, Certified
Stenomask Reporter, in and for the State of
Louisiana.

Blumberg No. 5138

STATE'S
EXHIBIT
I

*ASSOCIATED REPORTERS, INC.*
*Mark LaCour, C.C.R.*
*(225) 216-2036*

## A P P E A R A N C E S

**FOR THE PLAINTIFF, DANIEL DAVIS:**

GRODNER LAW FIRM
Attorneys at Law
Quail Run Drive, Suite B-1
Baton Rouge, Louisiana  70808

BY:   BLAKE S. LEGER, ESQ.

**FOR THE DEFENDANTS, DANIEL DAVIS, ET AL:**

STATE OF LOUISIANA
Department of Justice
Civil Rights Sect., Litigation Div.
1885 North Third Street
Baton Rouge, Louisiana  70802

BY:   STACEY JOHNSON, ESQ.

# C O N T E N T S

**EXAMINATION OF DR. TOBE MOMAH:**                    **PAGE:**

By Mr. Leger:                                                                4

By Ms. Johnson:                                                      (None)


\* \* \* \* \*


Stipulation:                                                                4

Reporter's Page:                                                          48

Certification:                                                            49


\* \* \* \* \*


**MARKED EXHIBITS:**                                        **PAGE:**

Exhibit One:                                                              36



S T I P U L A T I O N

It is stipulated and agreed by and between all parties that this deposition is hereby being taken pursuant to the Federal Rules of Civil Procedure.

All formalities, including the reading and signing of the transcript by the witness are hereby waived.

All objections, except those as to the form of the question and the responsiveness of the answer are reserved until the deposition is used or sought to be used in evidence.



\* \* \* \* \*

**TOBE SAMUEL MOMAH, M.D.**

2913 Desaird Street

Monroe, Louisiana 71201

HAVING BEEN FIRST DULY SWORN

TESTIFIED AS FOLLOWS:

**E X A M I N A T I O N**

BY MR. LEGER:

Q.    Good afternoon, sir.  Can you please state your full name?

A.    Tobe Samuel Momah.

Q.    Can you spell that?



ASSOCIATED REPORTERS, INC.
Mark LaCour, C.C.R.
(225) 216-2036

A.      Tobe, T-O-B-E.  Samuel, S-A-M-U-E-L.  Momah, —O-M-A-H.

Q.      Okay.  And what is your date of birth?

A.

Q.      And where do you live just generally?  What town do you live --

A.      West Monroe.  West Louisiana.

Q.      Okay, so you did drive far today.  How are you employed?

A.      Primary Health Service Center, Family Physician.

Q.      Primary Health Service Center. Is that in West Monroe?

A.      It's in Monroe.  It's a twin city.  Monroe is the other half of the city.

Q.      Okay.  You said Primary Health Service Center?

A.      You want the address or just the name?  That's the name of the clinic.

Q.      Okay, yeah, you can give me the address.

A.

Q.     Okay.

A.

Q.     And what do you do over there?

A.     I'm a family physician.  I major in treating the adults and the children, primarily the adults because we have a pediatrician on board as well.

Q.     Okay.  And where did you go to medical school?

A.     Medical school was University of Nigeria, College of Medicine in Enugu, Nigeria.

Q.     Okay.  When did you graduate medical school?

A.     May 2000.

Q.     Okay.  And do you also work at Louisiana State Penitentiary?

A.     I used to work at Louisiana State Penitentiary Treatment Center.

Q.     When did you stop working?

A.     February 1st 2012.

Q.     Okay.  And what is the reason that you stopped working at LSP?

A.     The letter I got from the warden and the clinic said they had budget cuts

and so they had to relieve some positions, and mine was like they say the last to come and the first to go.

Q.    Okay.  You mentioned -- I don't know if you mentioned it.  Do you have like a speciality as a physician?

A.    Family medicine.

Q.    Family medicine.  Okay.  When did you start working at Louisiana State Penitentiary?

A.    April 18th, 2011.

Q.    Okay.  And at that time were you living -- on April 18th 2011 were you living in West Monroe?

A.    No.

Q.    Where were you living at that time?

A.    I was living in Ruston.

Q.    Okay.  I guess what caused you to seek employment or be employed at Louisiana State Penitentiary?

A.    I had met Warden Cain at my church in Brooklyn, Brooklyn Tabernacle, and he had requested a doctor.  We struck a deal which came to fruition at that

clinics of the different camps.  Was there -- was there a particular clinic you were working in that day?

A.    Well, I don't remember that clinic that day.

Q.    But did you work in different --

A.    I was --

Q.    -- clinics at different times when you working at LSP?

A.    I was detailed to Camp J when I was there most of the time.

Q.    So most of the time you were working in the Camp J clinic?

A.    Camp J clinic.

Q.    Okay.  So the inmates are treated at the clinics but they're also treated at the treatment center, is that correct?

A.    Well, we only bring them to the treatment center when there's an emergency or an acute condition that would warrant an ER, emergency room evaluation.  So the clinics are for chronic care management.

Q.    I see, okay.  So a more serious or severe situation or condition --

day or not.  We had five physicians on staff on that day.

Q.    Okay.  I represent Raymond Fobbs who was an inmate here at that time on that date.  Do you know who Raymond Fobbs is?

A.    I've read his medical chart.  I don't know him personally.

Q.    Right, right.  Did you have occasion to treat him on that day?

A.    I saw him in the treatment center.

Q.    Okay.  You saw him in the treatment center.  Do you remember approximately what time of day that was?

A.    The notes detail three -- that's 15, I believe 15:30 he was in the treatment center and 15:45, from what I see he left the treatment center.  This is detailed by the EMS, the Emergency Medical Service staff sergeant which typically is pretty accurate.  So what --

Q.    Okay.  So you said it's detailed in the notes.  Are you referring to a report that would have been done by EMS

staff?  If you don't know that's fine.

A.    The medical chart, that's his history is obtained in his chart.  I got a copy of it from Ms. Stacey Johnson. Basically it says what time he was brought in and what time approximately that he left.  What happens in the emergency room is they only call the physicians when a patient arrives and they want us to see the patient.  So at that point he came in. They saw him and they at that point called me to see what they need to do for him at that point.

Q.    Okay.  So you were in the -- you were working -- were you working in the treatment center that entire day?

A.    From my calculations it was 3:45.  Probably I was on call but I'm not going to state unequivocally that I was on call.  But I'll just say I was in the treatment center at the time Raymond Fobbs was brought in and I was probably the first physician detailed to see him.  That was why I saw him at that time.

Q.    Okay.  And why would you have

been working in the -- why would you have been in the treatment center at that time as opposed to working in one of the clinics?

A. Like I said earlier the clinics typically they want you to be out of there before three o'clock.

Q. Out of the clinics?

A. Before three o'clock -- because there's a lot of charts you bring over. There's a lot of equipment you bring over. It just makes it more flexible and easier to manage if you leave the clinics on time. So if I was back from the clinic at three o'clock and he came in a 3:45 there's a huge chance I saw him after my clinic shift. That's what I suppose.

Q. Okay.

A. I don't recollect the exact time details of that day. But that's what I --

Q. Okay. To the best of your recollection what was Raymond Fobbs -- I guess what issues was he presenting with that day?

A. My recollection is at most vague

but I will do the best based on the notes I got from the medical records.

Q.    Let me just ask you, did you bring the notes today?

A.    I did.

Q.    Okay.  Can I see what notes you're referring to?  Okay.

**MS. WRIGHT-JOHNSON:**

And, Blake, we gave those to y'all in discovery.

**MR. LEGER:**

Okay, I just wanted to make sure we were talking about the same thing, okay.

**BY MR. LEGER:**

Q.    And I'm sorry, go ahead and --

A.    I'm sorry, can I make a correction?  I said he came in at 15:30 but he left at 17:45, not 15:45.  So that was a mistake I said.

Q.    Okay, and you're correcting yourself based on --

A.    So it should be 17:45, not the 15:45.

Q.    -- the notes?

A.    Yes, sir.

Q.    Okay.  All right.  And just -- I know you -- you reviewed these, correct?

A.    Yes.

Q.    Without -- without reading them or reviewing them right now just tell me from what your recollection what issues he was presenting with that day and what transpired?

A.    My memory is in conjunction with the notes.  It says he came in and he was short of breath and he was administered oxygen and Albuterol.  Albuterol is what we call a beta agonist.  It's used to treat anybody with asthma exacerbation.  So the EMS had administered that on arrival.  By the time I saw him and examined him I noticed he had what we call rhonchi.  That means he was -- he had some -- rhonchi is basically wheezing but it's a -- it's a difficult breathing in the process of breathing.  So I noticed that when I listened to him with me stethoscope.  My responsibility to the patient was to first and foremost relive

him of his difficulty breathing. So what I did was administer -- continue the oxygen, administer what we call Solu-Medrol intravenously.

Q. Can you spell that?

A. It's S-O-L-U-M-E-D-R-O-L. S-O-L-U-M-E-N-D-R-O-L.

Q. Okay, what is that?

A. That's a steroid which is administered through the vein in an acute exacerbation of an asthma attack. So we administered the IV Solu-Medrol, 250 milligrams in one bag. He had already obtained oxygen. He had already obtained what we call the mask with the Albuterol which is a nebulizer treatment. He had already obtained from what I see in the chart is one liter of normal saline, which is an IV fluid. So I gave him the Solu-Medrol. I also -- other things we did after that was his blood pressure was very high. So I told them to also give him Clonidine, which is a blood pressure pill.

Q. Okay, can you spell that?

A. That's C-L-O-N-I-D-I-N-E. So we


Blumberg No. 5138

STATE'S
EXHIBIT
I-1

did that just to make him comfortable and stable. And we maintained him on oxygen through a nasal cannula at two liters per minute.

Q.    Is that a mask or --

A.    Well, this is after getting the nebulizer treatment which is a mask then the one with the nasal prongs, it's called just oxygen via a nasal cannula.

Q.    Okay.

A.    You can set it between one and six. He came in at -- oxygen was 99 percent. But he was wheezing. We did that just to help him breath with less difficulty.

Q.    Okay. So you -- is this right? You said you administered the Albuterol by way of the mask, the nebulizer and you administered Solu-Medrol by way of -- intravenously 250 milligrams. Okay. Okay. What happened after that?

A.    We monitored him in the emergency room. We took pictures as detailed by the staff sergeant in the emergency room of the places where he had

some bruises.

Q.    Okay.  Who took the pictures, do you know?

A.    Well, I don't know the name but it signed by Master Sergeant who was a medical service staff.

Q.    Okay, a master sergeant who was also an EMS staff, okay.  Why were pictures taken?

A.    Standard protocol.  Every altercation in the emergency room has to be photographed.

Q.    Okay.

A.    That's just -- they don't do it -- they do it without even calling us. It's a standard protocol for every altercation that comes through the treatment center.

Q.    So besides the issues -- besides the issues that he was having with his asthma and respiratory issues you said you observed -- did you physically exam his body and you observed bruising?

A.    Yes.

Q.    Okay.

A.    The pictures -- like I said this is six months probably or 13 months ago. So you bear with me I don't remember --

Q.    Right.

A.    -- precise details.  But I know from the pictures and from the notes I've reviewed there was a bruise on his wrist, some bruises on his shoulders, and then there was what I called in my note a contusion which is like a redness.  No broken skin.  Just a redness on his big toe on his right foot.

Q.    What's the difference between -- and it may be totally different.  What's the difference between a bruise and a contusion?

A.    Well, a bruise there's a break in the skin.  There's no bleeding. There's no -- it's not a wound, per se. It's just surface injury.

Q.    So less severe than a bruise?

A.    No, that's a bruise.

Q.    Okay, that's a bruise.

A.    A bruise -- a bruise is just a scrape of the skin.  A contusion there's

no break in the skin.  So a contusion is swelling with redness but no break in the skin.  A bruise is a break in the skin, maybe some swelling, but no active bleeding.  You might find one or two spots here but no profuse bleeding.

Q.    Okay.  From what you examined on Raymond Fobbs's person was he bleeding at all?

A.    Not when I examined him.  At the point I saw him there was no active bleeding.  Some people bleed before you see them because they may have -- they may have spotted.  But at the time I saw him I didn't see any active bleeding.

Q.    Okay.

A.    My focus was primarily on his asthma and making sure he was comfortable breathing.

Q.    Okay.  So other than the asthma, the respiratory issues, contusion, bruises was there any other visible injury?

A.    Not to my knowledge.  Not to my knowledge on the day of the altercation.

Q.    Okay.  Was he unconscious at



anytime?

A.    Not to my knowledge.

Q.    Did he speak to you about what transpired in regards to the altercation?

A.    Not -- I don't recall a conversation with him.  I may have but it doesn't -- it doesn't ring a bell.  I don't recall that.

Q.    Okay.

A.    Maybe I'll just re-emphasis that when somebody comes in and the blood pressure was almost 200, he was wheezing, you tend to be on top of the medical more than the security or the social.  So as a physician I'm primarily responsible for the patient.  So I probably in that circumstance just focused on just getting him out of his situation medically.  I most likely wasn't interested in the circumstances under which it transpired.

Q.    Okay.  Did you prescribe any medicines, medications for him that day?

A.    I prescribed I believe some Tylenol, some pain medicine and I prescribed some Prednisone.  Prednisone is

a -- it's another steroid but this time it's an oral. That's by mouth, tablet, people take over maybe five to ten days to get them through their asthma exacerbation.

Q. So the Prednisone, the primary purpose of prescribing that would be related to the asthma?

A. The asthma.

Q. And the Tylenol, what was the purpose for prescribing --

A. The pain. The contusion on the foot, the bruises, relieve the pain.

Q. Okay. I know you said you don't remember the substance of his specific conversation. Do you remember him telling you that he was in pain?

A. No.

Q. Do you remember him telling you anything in the treatment center?

A. I don't remember. And I just want to make an emphasis here, when somebody has a very high blood pressure like he did he cannot take a lot of -- I will use the word aggressive pain medicine

because a lot of them elevate the blood pressure. We have some pain medicines we call non-steroidal anti-inflammatories. Unfortunately this will make his pressure go higher. Tylenol is the only that will not make it go higher. So even if he mentioned it to me I wouldn't have -- I wouldn't have approved his request because I was looking at his blood pressure as a reason not to get what they call intramuscular Toradol or any of the non-steroidal anti-inflammatories like Toradol or Meloxicam or Naproxsen or Ibuprofen.

Q.    Okay. So was the treatment that you administered the -- or that you ordered, the breathing treatments, the medications, did you find that to be successful for treating the issues that he had at that time?

A.    It did. I see that in the -- before he left the rhonchi which is the difficulty breathing had reduced. We had -- it had subsided for that time and we told him to follow-up with the camp clinic I believe. I think -- it's normally a one

week appointment. That's a standard protocol.

Q. Okay. Do you remember if he was restrained at the time?

A. I don't remember, sir.

Q. Are inmate generally restrained when they come in -- into the treatment center and deal with a physician?

A. It depends on the circumstances under which they were brought. Some walk in, some come in with security.

Q. Okay.

A. So it depends on their circumstances.

Q. Just to go back briefly to the bruises and the contusion. Where did you say those were?

A. I remember on the wrist, I believe the right wrist. It's on a diagram in the notes clearly. But the shoulders, the wrist and the big toe. Those were the three areas that were documented.

Q. Okay. And he was wearing a jumper at the time, right?

A.    Not to -- I can't remember but more than likely but I don't remember the color or the picture, the nature of --

Q.    Okay.  Did you examine -- did you look at his legs?  Did you examine his legs when he came in to see if there were any bruises --

A.    I did.

Q.    -- or cuts or anything like that?

A.    And there were none.  Just that right big toe.  The big toe, I can't tell you if it's right or left.  But the big toe was swollen with some redness and that was all I noted.

Q.    So he didn't have any lacerations?

A.    On the toe?

Q.    Anywhere that you observed?

A.    Well, a bruise is technically a laceration but it's a superficial laceration.  So the shoulders, the wrists, technically you could say they were lacerations but they were superficial.  They weren't deep.



the treatment center.

Q.    Do you know anything about Raymond Fobbs's duty status at that time?

A.    No, I didn't.  We typically in the emergency room treat the acute condition and duty status is only talked about when they are ready to go back to their camp.

Q.    Okay.

A.    Then what we do as doctors is simply say maintain duty status except we feel there was a reason to remove or to change.  What we did as physicians was Dr. Roundtree was the only person who could -- he was the medical director while I was there.  He was the only person who could make any changes.

Q.    To a duty status?

A.    At least on a long term basis. I mean like if an inmate, a prisoner, came in and broke his leg and couldn't work on the field definitely I had to give him a three day or two week off duty.  But under normal circumstances we shouldn't be changing prisoners's duty statuses without



treatment center -- we call it the emergency room but we don't want to use that word because it's not really an emergency room.  This is the treatment center triage progress notes where we evaluate an acute emergency or exacerbation of any condition.

Q.    And when I asked you what notes you referred to -- or looking at the notes you presented today I count, one, two, three, four pages.  Is your handwriting on any of these pages?

A.    Yes.

Q.    Okay.  Is your handwriting on this first page?

A.    Yes, it is.

Q.    Is this all your handwriting?

A.    No.

Q.    Where is your handwriting?

A.    My handwriting is -- I don't know.  But my handwriting is --

Q.    Underneath where it says --

A.    -- underneath -- it's basically I would use the word if I was to draw a line it would be about this.  It's on the

second, lower half of the page, but with a little -- not all the lower half of the page. So everything on this side was my handwriting.

Q.    Everything that you put the line around?

A.    Yes, sir.

Q.    Can you draw a line from here or from here and just put -- just initial it just to commemorate what you're referring to is what you wrote?

A.    Okay.

Q.    And I'm going to ask you to -- so this is not your handwriting here?

A.    No, this is not my --

Q.    Do you know who would have written this?

A.    The medic, the EMT, the Master Sergeant. Again, I don't know the name. It's not very easy for me to recall.

Q.    If I told you this said McClure does that sound right or can you say?

A.    No, I can't.

Q.    Can you read what you wrote? Whatever you can identify on this page

that you marked with your initials, can you read all of what you actually --

MS. WRIGHT-JOHNSON:

Okay, Blake, let me note the objection that you're using an exhibit or document that the opponent brought to the deposition to question him on it. I'm going to object to that.

MR. LEGER:

Based on what?

MS. WRIGHT-JOHNSON:

Based on the fact that if you want -- if you knew you were deposing our physician you should have brought your own medical records to ask him questions from. That's the basis of my objection.

MR. LEGER:

What is the actual objection?

MS. WRIGHT-JOHNSON:

I just said what it is. You didn't bring your own documentation. That's the bottom line.

MR. LEGER:




Okay, but that would be a speaking objection. Do you have a specific objection --

MS. WRIGHT-JOHNSON:

That's my objection and we can continue on. Speaking or otherwise it's an objection and it's a valid one that you didn't bring your own documentation to depose our physician on and you're using the documentation that he brought to question him. So let's go.

BY MR. LEGER:

Q. Can you read what you wrote?

A. Like I said, status post confrontation. Complains of shortness of breath secondary to spray following incident. Then examination respiratory. Positive bilateral rhonchi and CVS, which means cardiovascular system. I wrote irregularly irregular heart rate. Then musculoskeletal system I wrote the left hallux, which is the left big toe and bilateral shoulders show a contusion and a bruise with swelling. But there's intact



range of motion.  Then I go to impression. Oh, then I wrote here chest x-ray was done.  It shows no infiltrates.  An x-ray of the foot was done.  It showed no fracture.

Q.    You said chest x-ray no infiltrates.  What does that mean?

A.    Well, that means no infection.

Q.    Okay.

A.    So impression was status post altercation that asthma moderate to severe.  Then I wrote here right hallux, which is big toe contusion.  I wrote contusion and then I wrote the plan and assessment.  IV piggy back Solu-Medrol 250 milligrams one dose.  IV fluids, normal saline, one liter.  Then I wrote here if blood pressure increases to give 0.2 milligrams of Clonidine.  Then I wrote dry dressing for the foot and any of the injuries.  Then I wrote Prednisone PO taper pack, which is a slowly reduced dose or Prednisone.  And that was all I documented on that.

Q.    Okay.  And this is -- what you

Can we identify the page, Blake? Can you describe what it is and the date that's on it so that we can know what's being referred to?

BY MR. LEGER:

Q.    All right, go ahead, Doctor.

A.    This is a page from Mr. Fobbs asking for treatment for a rash on his neck.

Q.    Okay.

MS. WRIGHT-JOHNSON:

What's the date?

THE WITNESS:

8/21/2011.  But I must note that this was at five in the morning just for emphasis before the altercation.

BY MR. LEGER:

Q.    What does this page represent?

A.    This is called a body chart.  On the day of the altercation the EMS took pictures and documented on this body chart areas of his body that had any injuries.

Q.    Is any of your handwriting on this page?

A.    No.

Q.    Did you participate in the --

A.    I look at the site physically. I examine it for -- I don't fill out a form and I don't take the pictures.

Q.    Okay.

A.    The EMS -- EMT does that.

Q.    Did you physically see the pictures taken?

A.    I don't recall seeing the pictures --

Q.    Let me rephrase that. Did you see someone take the pictures?

A.    I don't recall.

Q.    This is the fourth page that you brought, Doctor. What is this page?

A.    This shows the electrocardiogram of Mr. Fobbs on the day he was in the treatment center.

Q.    What is an electrocardiogram?

A.    An electrocardiogram is a diagrammatic description of how your heart is beating. It tells us how fast, how slow, abnormal, irregular. That's what it shows.

Q.    Okay. Does this particular one

show anything unusual or anything to be concerned about?

A.    It doesn't.  It shows he was having a fast heart rate, about a hundred, 110.  That was about all the only abnormality shown on this EKG.

Q.    All right.

MR. LEGER:

So I'd like to attach these three pages as I guess Number One in globo.

MS. WRIGHT-JOHNSON:

Can I see --

MR. LEGER:

Yeah.

MS. WRIGHT-JOHNSON:

Thank you.  All righty.

MR. LEGER:

Just give me one moment.  I think that about does it.

BY MR. LEGER:

Q.    Unless there was something I missed or something you wanted to --

A.    No.

Q.    All right.  That's all the

# R E P O R T E R ' S    P A G E

I, Mark LaCour, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talk overs; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript.

Also, any words and/or names which could not be verified through reference material have been denoted with the phrase "(inaudible)."

Mark LaCour, C.C.R.

\#   8 9 0 5 4

C E R T I F I C A T I O N

I, the undersigned reporter, do hereby certify that the above and foregoing is a true and correct transcription of the stenomask tape of the proceedings had herein, taken down by me and transcribed under my supervision, to the best of my ability and understanding, at the time and place hereinbefore noted, in the above-entitled cause.

I further certify that the witness was duly sworn by me in my capacity as a Certified Court Reporter pursuant to the provisions of R.S. 37:2551 et seq. in and for the state of Louisiana; that I am not of counsel nor related to any of the counsel of any of the parties, nor in the employ of any of parties, and that I have no interest in the outcome of this action.

I further certify that my license is in good standing as a court reporter in and for the state of Louisiana.

OFFICIAL SEAL
MARK LACOUR
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 89054
Certificate expires 12-31-12



Mark LaCour, C.C.R.

#  89054

**ASSOCIATED REPORTERS, INC.**
Mark LaCour, C.C.R.
(225) 216-2036

## ROBERT E. BARROW, JR. TREATMENT CENTER
### ACCIDENT / INJURY REPORT
### VITAL STATISTICS

DATE __8 , 21 , 11__                                    TIME SEEN: __15 . 30__

NAME: __Raymond Tabb__ _____ DOC#: __136215__ ____ AGE: __44__ RACE: __B__

LIVING QUARTERS: __Tiger__ _____ JOB ASSIGNMENT __L-19__ ____ LAST TETANUS: ____

| MEDICATIONS | ALLERGIES: |
|---|---|
| See Pg 1 | none |

| DATE OF ACCIDENT: | TIME OF ACCIDENT: | ACCIDENT LOCATION: |
|---|---|---|

| | BP | PULSE | RESP | LOC | | TEMP | BS/SpO2 |
|---|---|---|---|---|---|---|---|
| TIME: 1630 | B/P: 154/100 | PULSE: 96 | RESP: 14 | LOC: Alert | | TEMP: 98.0 | BS/SpO2: 100% |
| TIME: 1745 | B/P: 152/90 | PULSE: 88 | RESP: 14 | LOC: Alert | | TEMP: 95.0 | BS/SpO2: 100% RA |
| TIME:   :  | B/P:   /  | PULSE: | RESP: | LOC: | | TEMP: | BS/SpO2: |

### CHIEF COMPLAINT AND INITIAL ASSESSMENT

**CHIEF COMPLAINT, HISTORY AND ASSESSMENT:**

@ 1630 pt was received from MSgt. McClure. pt was involved in confrontation + had on chemical agent used by security. pt had normal respiratory effort @ this time, with mild Rhonci rales + wheezing. noted skin irritation. @ distress @ this time. pulses strong + regular. superficial abrasion to (R) shoulder and (L) wrist. @ bleeding @ shoulder. Capillary bleeding @ wrist, controlled by clotting to (L) great toe. has bandage.

MEDIC SIGNATURE: __Lt Leckie 873__

### PHYSICIAN ASSESSMENT AND TREATMENT

☐ **CATEGORY A**          ☐ **CATEGORY B**          ☒ **CATEGORY C**

***SEE DEFINITIONS ON THE BACK OF THIS SHEET FOR EXPLANATION OF CATEGORY***          C.1

Salu-medrol being completed – finished @ 1730pm

Clonidine 0.3mg PO @ 1640pm per Momah's order on Pg1

Body Chart attached

Toe bandage came off. Re-bandaged

IV DIC    BBS @ CTA @ 1740    SpO2 @ 100% on RA.

RTC ē Kx   Prednisone Taper

bng Momah   RX on box

RTC   @ significant injury

| EXHIBIT |
|---|
| MOMAH |
| 1 |

☐ Duty Status _____          ☐ Appointment

☐ Diet _____          ☐ Dressing Change _____

PHYSICIAN SIGNATURE: _____

| TIME LEFT 1745 | TRANSPORTATION Self ___ DESTINATION ___ |
|---|---|

LSP TC 07        Rev 11/2006        ACCIDENT/INJURY REPORT        PAGE 2 OF 2

ROBERT E. BARROW, JR. TREATMENT CENTER
ACCIDENT/INJURY REPORT
VITAL STATISTICS

DATE 8, 21, 11                                            TIME SEEN 15 30

NAME: Raymond Fobbs          DOC#: 130215    AGE 44    RACE: B

LIVING QUARTERS Tig          JOB ASSIGNMENT C-19    LAST TETANUS:

MEDICATIONS: Clonidine, Docusate, TUMS    ALLERGIES.
Albuterol, Ranitidine, hctz, Clonidine    NKDA
hctz,

DATE OF ACCIDENT            TIME OF ACCIDENT Approx 1450    ACCIDENT LOCATION Tig/Tr RA
8-21-11

| TIME 15 8 | B/P: 199/124 | PULSE: 115 | RESP 4 | LOC: ABO | TEMP: 99 3 | BS/SpO2 99% |
|---|---|---|---|---|---|---|
| TIME: | B/P: / | PULSE: | RESP: | LOC: | TEMP: | BS/SpO2: |
| TIME: | B/P: / | PULSE: | RESP: | LOC: | TEMP: | BS/SpO2. |

CHIEF COMPLAINT AND INITIAL ASSESSMENT

CHIEF COMPLAINT, HISTORY AND ASSESSMENT: 44 y/o B/M ambulatory to ATU after being involved in confrontation & being gassed by security

1000 NS (R) Hand 20ga Cath T/L 1st    MEDIC SIGNATURE:

PHYSICIAN ASSESSMENT AND TREATMENT

☐CATEGORY A          ☐CATEGORY B          ☐CATEGORY C

***SEE DEFINITIONS ON THE BACK OF THIS SHEET FOR EXPLANATION OF CATEGORY***

O₂-2-1pm via nasal cannula 1540
X-Ray

☐Duty Status
☐Diet

PHYSICIAN SIGNATURE

| TIME LEFT | TRANSPORTATION | DESTINATION |
|---|---|---|

I SP TC 07    Rev 11/2006    ACCIDENT/INJURY REPORT    PAGE    OF

LOUISIANA STATE PENITENTIARY
R. E. BARROW, JR. TREATMENT CENTER

BODY CHART

NAME: Raymond Felix   DOC: 130215   DATE: 8/21/11



BACK   PALM



R



L





BODY CHART