# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RAYMOND C. FOBBS #130215** | : | **CIVIL ACTION** |
| | : | **NUMBER: 11-700-BAJ-SCR** |
| **VERSUS** | | |
| | : | **JUDGE JACKSON** |
| **DANIEL DAVIS, ET AL.** | : | **MAGISTRATE RIEDLINGER** |

**STATE OF LOUISIANA**
**PARISH OF WEST FELICIANA**

## AFFIDAVIT

**BEFORE ME,** the undersigned Notary, personally came and appeared:

### JOHN SANDERS

the undersigned affiant, having first been duly sworn, did depose and state under oath the following:

1.

I have been employed by the Department of Public Safety and Corrections, Louisiana State Penitentiary at Angola, Louisiana (LSP) for 8 years.

2.

I am currently a Corrections Captain.

3.

I have reviewed the claims asserted by inmate Raymond Fobbs DOC# 130215 in suit number USM-11-700, wherein he alleges I subjected him to excessive force and failed to protect and/or insure his safety on the Tiger Unit at Camp C on August 21, 2011.



STATE'S EXHIBIT J — Blumberg No. 5138

1

4.

Plaintiff was placed in administrative segregation for aggravated sex offense on August 21, 2011.

5.

I escorted plaintiff into the shower cell on the Tiger 1 right unit of Camp C and gave him several direct verbal orders to take his clothes off so he could be shook down and placed in a jump suit.

6.

Plaintiff flatly refused all orders given.

7.

At that point, I exited the tier and retrieved a can of Sabre Red Phantom chemical agent and returned to the shower cell.

8.

I gave plaintiff several more direct verbal orders to take his clothes off and he again flatly refused all orders given.

9.

I then had to administer a one second burst of chemical agent in the shower. I then gave plaintiff several more direct verbal orders to take his clothes off and again, he flatly refused all orders given.

10.

I had to administer another one second burst of chemical agent in the shower.

2

11.

I then gave inmate Fobbs another direct verbal order to take off his clothes to which he complied.

12.

Plaintiff was shookdown, given a shower, a clean jumpsuit and restrained so he could be escorted to a cell on the tier.

13.

As the shower door opened, plaintiff tried to head butt me and I had to take him to the ground to gain control of the situation.

14.

I escorted plaintiff into his cell. I had to grab him and push him into the cell because he continuously resisted.

15.

I was not aware plaintiff had asthma and he did not tell me he suffered from the condition before mace was released into his cell

16.

I, along with plaintiff, were sent to the Assessment and Treatment Unit to be checked for possible injuries that may have occurred during the confrontation.

17.

Major Daniel Davis, Assistant Warden Chad Menzina (Duty Warden) and Lt. Col. Cassandra Temple, who was the duty investigator, were all advised of the incident.

3

18.

I wrote plaintiff up for defiance and aggravated disobedience after the incident. I also prepared an unusual occurrence report.

19.

The force that was applied on August 21, 2011 was applied in a good faith effort to maintain or restore discipline, not or maliciously and sadistically for the very purpose of harming inmate Fobbs.

20.

Contrary to the allegations asserted against me in the complaints, I did not subject plaintiff to force, excessive or otherwise, on August 21, 2011. I likewise did not fail to protect and/or insure his safety on the aforementioned date.

The above facts are true and correct to the best of my knowledge, information and belief under penalty of perjury.

_____                    _____
WITNESS                                                                          JOHN SANDERS

_____
WITNESS

SWORN TO AND SUBSCRIBED before me, this ___3rd___ day of ___December___, 2012, at Angola, Louisiana.

Connie McCann #77912
EX OFFICIO NOTARY Connie McCann
LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS/LSP

4

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

NO. 11-700    JUDGE POLOZOLA    MAG. DALBY

* * * * * * * * * * * * * * * * * * * * * * * *

RAYMOND C. FOBBS

VERSUS

DANIEL DAVIS, ET AL.

* * * * * * * * * * * * * * * * * * * * * * * *

The deposition of John Sanders, taken on Tuesday, November 20, 2012, at the Louisiana State Penitentiary, Angola, Louisiana 70712, beginning at 11:18 a.m.

COPY

Reported by:

Tiffeny Suire Gallardo
Certified Court Reporter
In and For the State of
Louisiana

STATE'S
EXHIBIT
Blumberg No. 5138

ASSOCIATED REPORTERS, INCORPORATED
(504) 529-3355

**A P P E A R A N C E S**

Representing the Plaintiff:

> GRODNER LAW FIRM
> Attorneys at Law
> BY:   DONNA U. GRODNER, ESQ.
> 2223 Quail Run Drive, Suite B-1
> Baton Rouge, Louisiana   70806
> Phone: (225) 769-1919

Representing the Defendants:

> STATE OF LOUISIANA
> DEPARTMENT OF JUSTICE
> BY: STACEY JOHNSON, ESQ.
> 1885 N. Third Street
> Baton Rouge, Louisiana   70802
> Phone: (225) 326-6495

INDEX

PAGE

Caption . . . . . . . . . . . . . . . . . . . . . . . 1

Appearances . . . . . . . . . . . . . . . . . . . . . 2

Stipulations . . . . . . . . . . . . . . . . . . . . 4

Examination:

     By Ms. Grodner . . . . . . . . . . . . . . . . 5

Objections:

     By Ms. Johnson . . 20, 22, 23, 24, 50, 51,

     71, 79, 80, 85, 86, 87.

Exhibits:

     Sanders 1    Drawing . . . . . . . . . . . . 30

     Sanders 2    Drawing . . . . . . . . . . . . 62

     Sanders 3    Disciplinary Report  . . . 92

Reporter's Certificate  . . . . . . . . . . . . 95

S T I P U L A T I O N

It is stipulated and agreed to by and between counsel that the deposition of **John Sanders**, is hereby taken pursuant to notice and to the provisions of the appropriate statutes of the Louisiana Code of Civil Procedure;

That the parties hereto waive all formalities in connection with the taking of this deposition, including that of reading and signing; and

That all objections, except those as to the form of the question and/or the responsiveness of the answer, are reserved until the time of the trial of this case.

\* \* \* \* \*

Tiffeny Suire Gallardo, Certified Court Reporter, officiated in administering the oath to the herein witness.

**JOHN SANDERS,**

after being duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. GRODNER:

Q   Sir, state your full name for the record for us.

A   John Glenn Sanders.

Q   Junior?  Senior?  First?  Second?

A   No.  It's just John Glenn Sanders, J-o-h-n.

Q   Mr. Sanders, if you would, sir, take us from high school graduation forward to today with a general overview of your educational and work history.

A   I went to Marksville High School.  I graduated in 2003.  When I graduated from high school, I was working at a grocery store called Harvest Foods.

    And I quit working there in 2004, and I came to work at LSP.  And I've been working here ever since.

Q   How did you get from Marksville to

Angola?

A    I had friends that worked here and talked to them.  They referred me over here.  I came and applied and got hired.

Q    What friends was that?

A    David Gaspard.

Q    Is he employed with DOC?

A    He's retired now, but he was.  He retired maybe a year ago.  I'm really not sure, but he did retire.

Q    So you've been with LSP since 2004?

A    That's correct.  November 8, 2004.

Q    Why did you leave your job at the grocery store, Harvest Foods?

A    I wanted to make more money and have a job where I can have a career and possibly retire, possibly have retirement.

Q    If you could, when you hired on with LSP, take us forward with what you started off doing as to what you're doing today.

A    First got hired when I finished the academy, I worked in the field.

Q    You went to post academy?

here.  It's like a antenna tower.  And it's just fenced off to keep offenders from climbing the tower.

Q   Can you write "fence" next to that and "tower" next to that for me?

A   (Witness complies.)

Q   Thank you so much.  Okay.

So you told me that David Daniels, Major Daniels --

A   Daniel Davis.

Q   Daniel Davis looked out the window and what did he say?

A   He said that we got an offender masturbating on the yard.  He said, let's go.

Q   Then what happened?

A   Him and myself exited the office, walked down, got on the Tiger gate.  At the time we got on the Tiger gate, Sergeant Latoya Dennis, which is our pill officer, was standing right here (indicating).

Q   You can put an "X" where he was standing.

A   No, that's wrong.  It was right here

(drawing).

Q    Put an "X" where he's standing.

A    Who's that?

Q    Latoya Dennis.

A    That's a female, but she was standing on this walk right here (drawing).

MS. GRODNER:

Let the record reflect that the witness has placed an "X" on Sanders 1, with an arrow that says "Latoya Dennis."

BY MS. GRODNER:

Q    Who is Latoya Dennis?

A    She's our pill officer.

Q    An appeal officer?

A    Pass out offender's medication.

Q    Now, is she still with DOC?

A    Yes, ma'am.

Q    Is she here at LSP?

A    Yes, ma'am.

Q    So you guys are walking and you meet up with Latoya Dennis.  Then what happened?

A    So at this time, we got on the walk. Offender Fobbs turned around walking away so we wouldn't see him.

Q     Where was he?  Where was Offender Fobbs?

A     He was somewhere in this area (indicating).

Q     So he turned and walked away.  So he was walking in which direction?

A     You could tell he was trying to hide something the way he was walking away. Because when he saw us came out, he walked away in a quick fast manner to try to get away so that we wouldn't see what he was doing.  I'm assuming.

Q     So Latoya Dennis is standing here, and he's over here.  Do you think he was masturbating for her pleasure?

A     Nine times out of ten, he was looking at her while he was doing it.  I mean, I'm pretty sure.

Q     So he turns and walks away.  Then what happened?

A     Then Major Davis --

Q     I'm sorry.  What did Latoya Dennis, she was standing out on the yard, right?

A     She was standing on the walk.  She didn't notice what was happening.

Q     How do you know that?

A    Because she was talking to another offender on the walk right here (indicating).

Q    So there was an offender on the walk?

A    (Nodding head affirmatively.)

Q    You're shaking your head yes.

A    That's correct.

Q    Why would there be an offender on the walk?

A    They got orderlies and different offenders that work around the camp.

Q    So it was a male offender, I suppose, she was talking to on the walk?

A    It was a male.

Q    She's standing on the walk, rather than watching what's going on in this rec area, she's talking to another offender as you guys walk up?

A    That's correct.

Q    Then what happened?

A    Me and Major Davis arrived on Tiger Unit.  And we got Sergeant -- I'm not sure who was working on Tiger 3 and 4 Unit.  I really don't know.
       Got him to open up the gate for us.

where Latisha --

MS. JOHNSON:

Latoya.

BY MS. GRODNER:

Q     -- Latoya Dennis was and Offender Fobbs was?

A     You want the distance?  We walked all the way around.  But the distance, like, the straight distance?

Q     Yes, sir.  Between those two.

A     Approximately, 30 yards.

Q     So it wouldn't even be to from the goal line to the 50-yard line?

A     No.

Q     Thirty yards.  All right.  So you guys went through two gates.  You said Daniel called Fobbs over.

      Did he call him by name?

A     I don't remember

Q     Then what happened?

A     We placed handcuffs behind his back.  I don't remember if it was myself or Major Davis.

Q     And did you say anything to him?

A     I didn't say anything.

Q     What did Daniels say?

A     Major Davis told me to put him in admin seg, place him in admin seg.

Q     So let me get this straight.  One of y'all is carrying cuffs.

A     We both have cuffs.  But I can't remember which one of us cuffed him.

Q     One of y'all cuffed him and Davis tells you, Sanders, put him in admin seg?

A     That's correct.

Q     Now, what is the procedure for taking somebody to admin seg?  Do you have to call admin seg and say, hey, we're bringing an offender over?

A     No.  We walked him over.

Q     Listen to my question now.  I'm not asking you what you did yet.  I'm asking you what is the proper procedure?  You've been through some training at this facility, correct, sir?

A     That's correct.

Q     And you're familiar with the policies and procedures?

A     That's correct.

Q     So what is the proper procedure to bring

somebody to admin seg regardless of which one of these units you're on, camps you're on? What's the proper procedure in all the camps?

A    Well, you have to do a DB report on him.

Q    A DB report, okay. What else, sir?

A    And you have to notify the sally port so she can transfer him, or whoever is working the sally port, can transfer him, can take him off of one count and place him on another count.

Because he's being removed from his housing unit and he's being placed in a holding unit, which is admin seg. So he's got to be transferred in the count.

And any supervisor can place an inmate in admin seg. It's got to be a supervisor, which me and Major Davis are both supervisors.

Q    So you got to do the DB report. You got to notify sally port. Anything else you have to do before bringing that individual to admin seg?

A    He's got to be shook down visual body cavity search upon being placed in admin

seg.

Q  So he has to have a visual body cavity search before being placed in admin seg?

A  That's correct.

Q  So when he gets to admin seg, those people are going to do a visual body cavity search?

A  That's correct.

Q  What does that entail, a visual body cavity search?

A  Inmate takes all of this clothes off. When he's in admin seg, his clothes are taken away from him.  All he can have is a jumpsuit.

He's got to take his clothes off. He's got to open his mouth and move his tongue around.  He's got to lift his arms so you can see under his armpits, He's got to lift his testicles so you can see under them.

He's got to turn around, lift the bottom of his feet, so you can see the bottom of his feet.  And he's got to bend over and open up the cheeks of his anus, the cheeks of his buttocks, so you

enters a maximum security unit, it's got to be done. And admin seg is maximum security.

Q    Is Camp C maximum security?

A    Only half of it.

Q    So let's go back. We were on the yard. We had Major Davis. One of y'all put cuffs on Fobbs. Then what happened?

A    Then we got on the Tiger walk. Major Davis told me he was going back to the office to do his DB report. He told me to place offender in admin seg.

So I knocked on the door.

Q    So you knocked on the door of?

A    Of Tiger 1.

Q    And somebody had to get some keys to let y'all back through these gates?

A    That's correct. They did open the gate for us. They were standing in the gate. When we came out to cuff Offender Fobbs or to get Offender Fobbs to bring him in, they stayed at the gate and waited for us.

So we went out and got him and came back escorting him back, and they were

Blumberg No. 5138    STATE'S EXHIBIT    J-1

Tiger 1.  What happened?

A   Knocked on the door of Tiger 1. Sergeant Jeffrey Franklin stood up and opened the door and let me in with Offender Fobbs.

Q   Jeffrey Franklin, is he still here at LSP?

A   Yes, ma'am.

Q   Jeffrey Franklin, he's here at LSP.  So he let you in?

A   Yes, ma'am.

Q   What did you then do?

A   I walked through the Tiger lobby and told him Offender Fobbs was getting placed in admin seg.

Q   Who was over admin seg?

A   I was.

Q   You were over admin seg?

A   I was the captain over the cell blocks, and admin seg is part of the cell blocks.  So that's pat of my unit that I'm responsible for.

Q   Yes, sir.  But who was assigned to admin seg?  Certainly, if you were assigned to admin seg, you wouldn't be over here --

A    Sergeant Jeffrey Franklin.

Q    So Franklin was assigned to admin seg. Why couldn't you just turn him over to Franklin when you got to admin seg? Wouldn't that be the procedure for you to just turn him over to admin seg?

A    Not really.  He's just got to be shook down.

Q    Was Franklin unable to shake him down for some reason?

A    No, ma'am.

Q    Did Franklin ask you for help?

A    No, ma'am.

Q    Did Franklin say, I need you to come in here and take care of this particular person for me?

A    No, ma'am.

Q    So you really didn't have a reason to be in admin seg?

A    Only to make sure he got shook down properly.

Q    Did you feel that Jeffrey Franklin didn't have proper experience in shaking inmates down?

A    No, ma'am.

blocks?

A   Bear is a dormitory.

Q   How many beds in the Bear dormitory?

A   Four dormitories.  I think there was 95 beds at the time.  They've added beds. I think at the time there was 95.

Q   Any other dormitories or cell blocks that you were over besides Tiger, Jaguar, and Bear?

A   That's all.

Q   So you had an interest in making sure that Fobbs was properly shook down that day, correct?

A   That's correct.

Q   What did you then do?

A   Placed him in the shower, took the handcuffs off of him.

Q   Why did you -- you went to a shower?

A   That's normally where we do it at.

Q   Normally where who does what?

A   Where we do the shakedowns in the shower.

Q   Who is "we"?

A   Security.

Q   Security does their shakedowns in a

shower?

A     That's correct.  It's a shower type cell.  It's a cell.  It's got a cell door that locks in front of it.  We put them in the shower to make sure they're secure so we can lock the door and secure the offender.

Q     So you take him to a shower.  Now, where would I find in the procedures that when you do shakedowns you take them to the shower?

A     All the procedures says is they have to be shook down.  It doesn't specify where.

Q     So if I call Mr. Jimmy Leblanc, he's going to tell me it's okay for y'all to be taking these guys into the shower like this?

A     I can't answer that.  I don't know.

Q     Are you aware of any requirements to videotape these types of shakedowns?

A     No, ma'am.

Q     Are you aware of any requirements to videotape anything?  What about spraying people with chemical?

A    No, ma'am.

Q    No?

A    No, ma'am.

Q    No one has ever told you that before you administer a chemical agent that you need to have a video set up?

A    No, ma'am.

Q    So you took this individual in handcuffs to a shower.  Who was with you?

A    Sergeant Jeffrey Franklin was standing in the lobby.  He let me on the tier.

Q    So Franklin -- so you're doing Franklin's job for him now, is that correct?

A    No, ma'am.

Q    No?  Whose job would it be?

A    I'm just assisting.

Q    You were assisting Franklin?

A    That's correct.

Q    So Franklin takes him into the shower, and you're standing there watching?

A    I take him into the shower.

Q    So you took him into the shower.  What happened?

A    He was placed in the shower.  The shower

door was locked. It's done electrically. It's an electric panel. Sergeant Franklin stood there and locked it. I took the handcuffs off of the offender.

Q So you said come to the bars?

A That's correct.

Q And he came to the bars?

A Came to the bars, and the handcuffs were taken off of him.

Q Then what?

A Then I gave him a direct verbal order to take off his clothes so I could do a shakedown on him.

Q And Franklin was standing there?

A That's correct.

Q Then what happened?

A He refused to take his clothes off.

Q What was he saying?

A I don't remember exactly what he said. He said no, but I don't remember exactly every word he said.

Q Do you remember anything else he said?

A No, ma'am.

Q Then what happened?

A    I gave him several more orders to take his clothes off so he could be shook down, and he continued to refuse.

Q    Then what happened?

A    ' So he kept continuing to refuse.  So I left the tier, went to the chemical agent cabinet.

Q    You told us you were in Tiger 1; is that right?

A    That's correct.

Q    Tiger 1.  So you left the tier.  Where did you go?

A    In the lobby of the unit, which is right here (indicating).

Q    You went to the lobby.

A    And there's a chemical -- let's see. This is divided.  There's a chemical agent cabinet right here (drawing).

     MS. GRODNER:

          Let the record reflect the witness is marking the diagram.

BY MS. GRODNER:

Q    And where were the showers, if you don't mind?

A    (Witness drawing.)  There's two tiers.

There's Tiger 1 left and Tiger 1 right. There's a shower at the head of each tier.

Q   Now, Franklin stayed in there with Mr. Fobbs when you left to get this chemical agent?

A   Franklin stayed at the head of the tier. You can't go down the tier with keys.

Q   I was wondering about that, how Franklin was able to leave with the keys and go with you to the shower.

A   No.  He stood there and held the keys.

Q   But Franklin left his post with the keys and went into the shower area with the keys?

A   No, ma'am.

Q   No?

A   No, ma'am.

Q   So let's back up because I want to find out exactly where Franklin went. Franklin has the keys.  He let you in.

A   That's correct.

Q   Did he go into the shower area?

A   No, ma'am.  He stood at the head of the tier.  But the head of the tier is right

locked up.  You have him walk to the
bars.  You take the cuffs off.

A    That's all correct.

Q    And you tell him take off your clothes,
take off your clothes, take off your
clothes.  He says no, no, no.

A    That's correct.

Q    And then you tell him I'm going to get
the chemical agent?

A    No, ma'am.

Q    You never told him?

A    No, ma'am.

Q    No warning?

A    No, ma'am.

Q    So then what happened?

A    I went to the cabinet, and I got the
chemical agent, and I came back to the
shower.

Q    Okay.

A    And came back with the chemical agent in
my hand and gave Offender Fobbs several
more orders to give me his clothes.

Q    Did you ask him to come to the bars?

A    No.

Q    You just said, give me your clothes?

A    So he could be shook down.  That's correct.

Q    So then what happened?

A    So he still refused and said no.

Q    Then what happened?

A    At this time, I was forced to administer a one second burst of chemical agent to Offender Fobbs to attempt to gain compliance.

Q    Let me have you, if you could, draw me a picture of the shower area and show me where he was and where you were when you administered this one second burst.

A    (Witness complies.)  I'm not the best drawer.

Q    That's okay, sir.

        MS. GRODNER:

            We're going to mark that as Sanders 2.

BY MS. GRODNER:

Q    So what was your distance from him when you administered this chemical agent?

A    I don't know exactly.

Q    Was it more then 3 feet?

A    Maybe 5 feet.

Q    And then what happened?  Were you inside the bars or outside the bars when you administered the chemical?

A    I was on the outside of the bars. Offender Fobbs was on the inside of the bars.

Q    So then what happened?

A    So I administered the chemical agent. And I gave him several more orders to take his clothes off so that he could be shook down.

Q    Then what happened?

A    He continued to refuse.

Q    Then what happened?

A    So I had to administer another one second burst to try and gain compliance.

Q    Then what happened?

A    Offender complied.  I gave offender another order to take off his clothes, and he complied.

Q    Then what happened?

A    He was shook down.

Q    So you went through all that stuff you told us about checking the armpits, and the anus, and the testicles, and all

Q    that for Fobbs?

A    Yes, ma'am.

Q    Then what happened?

A    Then I gave him some soap, and he was given a shower.

Q    So if you're gonna apply the chemical agent, they need to be showered afterwards, right?

A    Policy is they have to be offered a shower.  They can refuse to take a shower, but they've got to be offered a shower.

Q    So they're right there in the shower, that makes it easy?

A    At that time, I just allowed him to shower while he was right there in the shower.

Q    He's already in the shower when you administered the chemical?

A    That's correct.

Q    So how did that come about that he ended up taking a shower?

A    Gave him a bar of soap and told him to take a shower.

Q    Did he say anything to you during this

period of time?

A    No.

Q    Nothing about hey, I've got asthma?

A    (Nodding head negatively.)

Q    You're shaking your head no, but --

A    No, ma'am.

Q    Was he coughing?

A    No, ma'am.

Q    Was his eyes watering?

A    Yes, ma'am.

Q    So his eyes were watering.  Any other effects from this chemical agent that was administered?

A    Nose was running.  That's just basic effects of the chemical agent.

Q    For what?

A    Nose running.  Sometimes they do cough. Most of the time eyes running, red eyes.

Q    Did it affect your eyes and nose?

A    Yes, ma'am.

Q    How did it affect you?

A    Made my eyes water, made my eyes burn.

Q    So approximately what period of time are we talking about before he took the shower from when you got back with the

chemical agent to when he was showering?

A    Maybe four minutes.  Approximately four minutes.

Q    So by the time you walked up to the cell with the chemical agent to the time that he was in that shower, that was about four minutes?

A    Right.

Q    So he's taking a shower.  What happens?

A    So he takes a shower.  I let him take a shower and all that.  After he finished showering, gave him a jumpsuit.

Q    What color?

A    I don't remember.  It was either white or orange.

Q    Then what happened?

A    Put on the jumpsuit.

Q    Then what happened?

A    Got some restraints from Sergeant Franklin, side restraints and shackles.

Q    Then what happened?

A    Placed the restraints on Offender Fobbs.

Q    Now, when you say "restraints," is that cuffs around the waist?

A    It's a chain with cuffs on it with a

padlock in the back.

Q    What about the feet?

A    Shackles.

Q    Shackles too, okay.  Then what?

A    Told Sergeant Franklin to open the shower door so we could move Offender Fobbs from the shower to the assigned cell.

Q    So was there a point and time when you went in that shower cell with him?

A    No, ma'am.

Q    No?

A    No, ma'am.

Q    You sure?

A    Positive.

Q    You were never at any point and time in the shower cell?

A    Positive.

Q    How did you do the shakedown through the bars?

A    Gave him an order to give me his clothes.  When he finally started complying, gave them to me.  Told him to open his mount.  He opened it.  I looked in it.  He moved his tongue around.

Told him to lift his arms up. He lifted his arms up. I looked at his armpits.

Told him to lift his testicles. He lift them up. I looked under them. Turned around and told him to lift the bottom of his feet. He lift the bottom of his feet. And then told him to bend over and spread the cheeks of his buttocks. He did all that and complied.

It's just a visual body cavity. You just visualize it. You don't actually have to touch anything. You just look with your eyes.

Q   So then you told him to come to the bars and be restrained?

A   M-hm (affirmative response).

Q   And he did that?

A   He did that.

Q   Then you unlocked it, or you had to call somebody to unlock that?

A   I told Sergeant Franklin to unlock it. He's got the electric panel, and all he does is open the doors electrically.

Q   Now, I notice you got a radio on your shoulder. You just radioed him to

unlock it?

A   I just told him.  He was standing maybe 5 feet from me.

Q   So Franklin was there during the shakedown?

A   That's correct.

Q   Was Franklin there during any other parts?

A   Yes.  Everything I just told you, he was there, chemical agents.

Q   So the guy with the keys has left his post and is in the shower with you?

A   No, ma'am.  He's standing at the head of the tier.  And you can see everything that's going on.  The head of the tier is maybe 5 feet from the shower.  And it's open.  It's bars.  You can see everything that's going on.

Q   So he was standing at the head of the tiers?

A   That's correct.

Q   And he was turning and watching all this.  He saw it all?

A   That's correct.

Q   Then what happened?

A     Where did we leave off?

Q     Did you talk to Franklin today or yesterday about what happened to kind of just job your memory on this case?

A     No, ma'am.

Q     You didn't?

A     No, ma'am.

Q     And Franklin is still out here, right?

A     To my knowledge, yes.

Q     What is his full name?

A     Jeffrey.

Q     Jeffrey Franklin.  Go ahead.  What happened next?

A     So I placed the restraints on Offender Fobbs.  I told him to open the shower door.  He opened the shower door.  At this time, Offender Fobbs came towards me with his head down and tried to head butt me in the chest.

     So I had to move and put Offender Fobbs on the ground to gain control of Offender Fobbs to get him to calm down and come into control.

Q     And that's something that Franklin would have witnessed?

A    That's correct.

Q    Then what happened?

A    Then I told Offender Fobbs to get up to walk to the cell.  He didn't want to comply.  He was pulling away from me resisting.

     So I grabbed his arm, and I pushed him into the cell because he wouldn't comply.  He wouldn't walk on his own power.

Q    So you pushed him to --

A    To the cell on the tier.

Q    In admin seg?

A    That's correct.

Q    Is there any video in that admin seg?  I know there's none on the showers.  Is there?

A    No, ma'am.

     MS. JOHNSON:

          Objection.  Asked and answered.

BY MS. GRODNER:

Q    No video on the tier either?

A    No, ma'am.

Q    Video in the yard?

A    No, ma'am.

Q    There's no video --

A    There's no video anywhere at Camp C.

Q    So you pushed him into a cell?

A    That's correct.

Q    Then what happened?

A    I yelled to Sergeant Franklin to close the cell.  And I don't remember what number cell it was.

Q    Then what happened?

A    He closed the cell.  I told Offender Fobbs to come to the bars so I could take the restraints off.

Q    Did he do that?

A    Yes.

Q    Then what happened?

A    Took the restraints off of him.

Q    Is there any video equipment at all in Camp C?

A    No, ma'am.

Q    Then what happened?

A    Then I left the tier and notified Major Davis.

Q    Notified him of?

A    Of the chemical agent situation and everything.

Q   You told him everything that happened?

A   That's correct.

Q   So you told Davis everything that happened?

A   Right.  He's my supervisor.  I have to report everything to him.

Q   Now, who was the supervisor on this shift?

A   Major Davis was the shift supervisor. He was the highest ranking officer there.

Q   Why is it that he wasn't the one that went and got the chemical spray?

A   Because he was doing, he went and started on the DB report.

Q   Is there a policy that says that the rank is the one goes and gets the chemical agent?

A   The policy says that the highest ranking officer on the unit at the time of the incident is the one that administers the chemical agent.

Q   Now, who was the highest ranking officer on the unit at the time?

A   At the time when Offender Fobbs refused

to be shook down, I was the highest
ranking officer on the unit.

Q   So Tiger 1 is one unit.  Is that what
you're telling me?

A   That's correct.

Q   So you told Davis what happened.  And
then what happened?

A   Then called the treatment center.  Had
Offender Fobbs sent to the treatment
center.

Q   Why?

A   Because I had to use force to take him
to the ground, and so he could be seen
for the use of chemical agents.

    As far as the policy, any time we
have to use force, they have to be seen
by medical.

Q   So you called the treatment center?

A   That's correct.

Q   Then what happened?

A   Called patrol to come get Offender Fobbs
and take him to the treatment center.

Q   Then what happened?

A   I also went to the treatment center.

Q   Then what happened?  What were you

treated for?

A    It's part of the policy.  Any time we're involved in a confrontation, we have to be seen by medical.

Q    So then what happened?  Did you have any injuries?

A    No, ma'am.  Maybe a minor scratch or something.

Q    You had a minor scratch.  Where was it?

A    Maybe, possibly.  I don't remember.

Q    If this possible scratch was possibly where?

A    Could have been on my hands, possibly, or my arm.

Q    Possibly on your hand, possibly on an arm.  How many of these scratches did you have possibly?

A    I don't remember.  I said they were possibly.  I don't remember.

Q    Would you have medical records that would indicate whether or not you had these scratches?

A    I don't remember.

Q    Do you have any problem with us getting your medicals to see if you had any