UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

RAYMOND C. FOBBS #130215          :          CIVIL ACTION

                                  :          NUMBER: 11-700-BAJ-SCR

VERSUS

                                  :          JUDGE JACKSON

DANIEL DAVIS, ET AL.              :          MAGISTRATE RIEDLINGER
**********************************************************************************

STATE OF LOUISIANA
PARISH OF WEST FELICIANA

## AFFIDAVIT

BEFORE ME, the undersigned Ex Officio Notary, personally came and appeared:

## ANGELA BUTLER

who, after first being duly sworn, did depose and say that:

1.

I have worked at the Louisiana State Penitentiary, Angola, Louisiana (LSP) since 1999.

2.

I have worked at Camp C since April 2012.

3.

At the request of the Attorney General's Office, I searched for the log book records from the Tiger Unit from August 21, 2011 at the Camp C Entrance Building, as well as the Archives Building.



STATE'S EXHIBIT A

4.

On October 2, 2012, I executed an affidavit that stated I was unable to find the log book records from the Tiger Unit on August 21, 2011, even though I found the Chemical Agent Quarterly Report for Camp C.

5.

After weeks of searching, I found the Tiger 1 and 2 gas logbook on October 25, 2012. The cover of the log book was ripped off through every day use. I was able to identify that the log book was for Tiger 1 and 2 based upon the items that were inventoried with the gas.

6.

Hard bound log books are no longer used at the prison. Log book records are made at the prison's print shop and bound with spiral coils.

The above facts are true and correct to the best of my knowledge, information and belief under penalty of perjury.

_____     _____
WITNESS                                                           ANGELA BUTLER

_____
WITNESS

SWORN TO AND SUBSCRIBED before me, this _____16th_____ day of _____, 2012, at Angola, Louisiana.

_____
EX OFFICIO NOTARY
LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS/LSP

2

BOBBY JINDAL
Governor

JAMES M. LE BLANC
Secretary

## State of Louisiana

### Department of Public Safety and Corrections
### B. B. "Sixty" Rayburn Correctional Center

TO WHOM IT MAY CONCERN

SUBJECT:    **MEDICAL RECORDS:**
RAYMOND FOBBS #130215

I certify the attached 4 pages are a true and correct copy of the medical records front and back dated November 28, 2007, March 24, 2009, and August 24, 2009 for offender RAYMOND FOBBS #130215

WITNESSES:

_Bessie Carter en, ccym, ecw_

_Cheryl Barber_

_Carolyn Westmoreland_
Carolyn Westmoreland
Medical Records Administrative Coordinator

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS 14th OF NOVEMBER, 2012.

_Daisy Wascom_
Daisy Wascom #84493
EX-OFFICIO NOTARY
Department of Public Safety & Corrections

STATE'S
EXHIBIT
B

**Louisiana State Penitentiary**
**Barrow, Jr. Treatment Center**
**Physician's Clinic**

| Name | | DOC | Location | Date: |
|------|------|------|------|------|
| **FOBBS** | **, RAYMOND** | **130215** | **CBA U/R** | **11/28/2007** |

BP: **138** / **84**   Temp **98.0**   Pulse **85**   Resp:**18**   Height **69**   Wt.: **206**   Time: **9:34:44 AM**

DOB                    40 year old B    Male

Allergies:    None Known

Reason for Visit:    **MIN SX**

Chief Complaint:

O2 Saturation [          ]

Educate on toe care & if pain
Onychomycosis elevate foot — Biopsy?

(R) first toe nail

Using sterile condition
+/- lidocaine digital block.
toenail removed w/o complication
Phenol applied to nail bed
matrix

Nail clipping done b/l feet

ATU started 11/30/07
1. Clean extract water
2. Silvadine cream
3. gauze dressing
x2 weeks

RT MS I w/th Toenail Removal

**Assessment:**

1. S/P toe nail removal

2.

3.

4.

5.

**Plan:**

1. wound care dressing

2. drug ? by mouth non 11/29

3. drug ? in PO 11/30

5.

Date    11/28/07

MD Signature

LOUISIANA STATE PENITENTIARY
R. E. BARROW, JR. TREATMENT CENTER
ANGOLA, LOUISIANA 70712

## AUTHORIZATION FOR SURGICAL TREATMENT

PLEASE READ THE FORM CAREFULLY. State law requires us to obtain your consent for your contemplated surgery. What you are being asked to sign is confirmation that we have discussed the nature and purpose of your contemplated operation and the risks associated with it, and that we have answered all of your questions in a satisfactory manner. Ask about anything you do not understand.

1. I hereby authorize ___Dr. P. Singh___ With associates or assistants of his choice to perform upon
___Raymond Fobbs___ ___130215___ the following surgical, diagnostic or medical
        Name                              DOC#
procedure ___TOENAIL REMOVAL_____.

Including any necessary or advisable anesthesia, to include local anesthesia and outpatient anesthesia (i.e. I.V. sedation). I further advise the doctors to perform any other procedure that in their judgement is advisable for my well being. This operation has been explained to me. Alternative methods of treatment, if any, have also been explained to me, as have the advantages and disadvantages of each. I am advised that though good results are expected, the possibility and nature of complications cannot be accurately anticipated and that, therefore, there can be no guarantee as expressed or implied either as to the results of the medical procedure or as to cure.

2. In general terms, the nature and purpose of this operation or medical procedure is:

___APPLICATION OF LOCAL ANESTHESIA FOLLOWED BY REMOVAL OF TOENAIL_____

Some risks (but not all) known to be associated with this procedure, including anesthesia are:

___INFECTION, BLEEDING, RECURRENCE_____

REACTION TO ANESTHESIA INCLUDING SEIZURE AND DEATH_____

I have been informed of the probability of occurrence of each of the foregoing risks as the result of, or in connection with, the surgical or medical procedure contemplated herein.

I hereby authorize and direct the above named doctor with associates or assistants to provide such additional services as they may deem reasonable and necessary including, but not limited to, the administration of any anesthetic agent, or services of the x-ray department or laboratories, and hereby consent thereto.

I hereby state that I have read and understand the consent, all questions about the procedure(s) have been answered in a satisfactory manner, and that all blanks were filled in prior to my signature. This consent is valid until revoked by me in writing.

SIGNATURE OF PATIENT: X _Raymond Fobbs_____    DATE: _11/28/02_

SIGNATURE OF RELATIVE: _____    (Where Required)
SIGNATURE OF REPRESENTATIVE: _____    (Where Required)

WITNESS: _____

I certify that all blanks in this form were filled in prior to signature and I explained them to the patient or his representative before requesting the patient or his representative to sign it.

Signature of the above named physician

R.E.

ROW, JR. TREATMENT CEN
PHYSICIANS CLINIC

NAME: Dayment Tubbs     DOC#: 13.7.13     CAMP: Twin D     JOB ASSIGN: _____

TEMP: 98.1     PUSLE: 72     RESP: 24     B/P: 140/94     WEIGHT: 202

DATE: 3.24.04     Flu  HTN, Hypotalcenua

TIME: _____     Asthma, Recurrent, Hematuria

ALLERGIES: NKA  41 y/o BM  69 in.

HTN —     HCTZ 25
          Clond 0.3 TID

CC ITCh.
Woods Benadul

PE M.
   I'm few adum

HTN
Asthma / smoky

Rx sent

JTY STATUS: _____

ET: _____

SC. ORDERS: _____

APPOINTMENT: 4/10

PHYSICIAN SIGNATURE: _____

C19   06/2006

PHYSICIANS CLINIC  DBrown
2.24-04 11 AM

LOUISIANA STATE PENITENTIARY
R.E. BARROW, JR. TREATMENT CENTER
PHYSICIANS CLINIC

NAME: Raymond Fobbs   DOC#: 130215   CAMP: Tig 2L   JOB ASSIGN: _____

TEMP: 98.5   PUSLE: 88   RESP: 20   B/P: 120/70   WEIGHT: 205

DATE: 8/24/09

TIME: _____

F/U HTN, asthma

ALLERGIES: NKA   42 BM   Ht 69 in

Had once astha attach to ER

Scratchy  wants Benadryl

HAS
itching

PE Diffuse wheezing
Fair air exchange

Renew RX sent                    PLP, Ch 14 slip sent
  Accolate                        Claritin PO
  Baritol                         DC Tums
  HCTZ                            Prilosec
  Clonidine
  Ventolin

DUTY STATUS: _____

DIET: _____

MISC. ORDERS: _____   JBrown, RN   APPOINTMENT: _____
P-TC19   06/2006      8-24-09 @ 1430   PHYSICIAN SIGNATURE: _____

PHYSICIANS CLINIC

THE
# BATON
# ROUGE
# CLINIC
AMC

<u>7373 Perkins Road</u>  •  Baton Rouge, Louisiana  70808-4326  •  225/769-4044

November 8, 2012

Ms. Stacy Johnson
Assistant Attorney General
Civil Rights Section, Litigation Division
State of Louisiana
Department of Justice
P.O. Box 94005
Baton Rouge, La. 70804-0006

Re: Case of Raymond Fobbs vs. Daniel Davis, et al

Dear Ms. Johnson:

I have had the opportunity to review the records that you supplied to me regarding this case. I have reviewed the prisoner's records in toto. I am, therefore, prepared to answer the questions that you posed to me. In regard to a complete statement of all opinions, I will express at trial and the basis and reasons for them that is difficult to state because I do not know what the questions are that I will be asked. The data that was reviewed that helped me form my opinion are the medical records of the prisoner. The only exhibits that I would use to summarize or support my opinions are the records themselves. My qualifications are that I am a board certified internist and pulmonary specialist. I have been practicing pulmonary medicine in the Baton Rouge area for nearly thirty years. I have solely practiced medicine over that period of time and have not submitted any publications, at least in the last ten years. In regard to supplying a list of cases which I have reviewed over the past four years, I am unable to do so. In the last four years I have not been an expert at trial, but have had several depositions regarding my opinion. These have both been for the plaintiff and for the defendant. As per our agreement, my compensation to be paid for review of the records and an opinion and testimony in this case is $500 per hour.

In regard to the severity of the plaintiff's asthma, I can only go by what the record would suggest and that is that the patient has mild persistent asthma. He required regular treatment and did not require hospitalization and had had no history that I could see of respiratory failure. He did require treatment with corticosteroids periodically over the years of his incarceration. It is my understanding that the patient is a consistent cigarette smoker. As you might expect, this habit is deleterious to the respiratory health of any individual. I would expect that it would contribute to exacerbation of his asthma and the requirement for continued medication. I note that the patient has been put on some restriction to avoid fumes and chemicals. A fume is a smoke, vapor, or gas that has some noxious qualities, i.e.

---

**DEPARTMENT OF PULMONOLOGY & CRITICAL CARE**

William H. Hines, M.D.
Robert C. Hinkle, M.D.
Mark K. Hodges, M.D.
Michael P. McCarthy, M.D.

- Allergy & Immunology
- Dermatology
- Endocrinology
- Gastroenterology
- Internal Medicine
- Neurology
- Otolaryngology
  (Ear Nose & Throat)

- Pediatric Neurology
- Pediatrics
- Pulmonology &
  Critical Care
- Radiology
- Rheumatology
- Surgery
- Urology



Blumberg No. 5138

STATE'S
EXHIBIT

Page Two

irritating or offensive. The smoke of a cigarette would certainly be considered a fume and would likely contribute to the worsening of one's respiratory status. The patient's duty status restricts him from fumes, however, the patient violates his duty status each time that he smokes. The record states that the patient was exposed to Mace on 8/21/11. Mace is a respiratory irritant and I would agree that his duty status was violated with that exposure. It appears that after exposure to Mace that the patient had an exacerbation of his asthma. It is of note that the patient had multiple exacerbations over the years without exposure to Mace. In light of his chronic asthmatic condition, any exposure to Mace would be considered too much.

I reviewed the record regarding the medical treatment of the inmate. In my expert opinion, I feel that he received appropriate treatment for his asthma on the day of the incident. In fact, he received appropriate treatment many times prior to the incident. The record would suggest that the patient did, in fact, have an asthma attack on the day of the incident. In regard to your inquiry as to whether asthma can improve over time, the answer is yes. The factors that aid in improvement of that condition are smoking cessation, avoidance of precipitators, and regular use of controller medication. It appears that over time the plaintiff's condition has actually improved as judged by the amount of medication that is required to control his condition. I do not have an opinion as to why I think the plaintiff's permanent duty status order from Rayburn Correctional Center specifically states he is not to be exposed to chemical agents. Chemical agents is a broad term. Some chemical agents are not precipitators of bronchospasm where as others are. Those chemical agents that are known respiratory irritants would be substances that the plaintiff should be shielded from.

The plaintiff, in my opinion, has little basis for his case. He has continued to smoke over the years which is a respiratory irritant and is linked with progressive pulmonary function decline. There is suggestion in the record that he has, from time to time, been non-compliant with use of regular medication for his asthma. Where as exposure to Mace may have precipitated an asthma exacerbation, it appears though that over the years that he has had multiple exacerbations. It would be my opinion that the exposure to Mace was no worse than him smoking cigarettes consistently. It also appears that he recovered well from that incident with the appropriate treatment administered by the medical staff. Without personally examining this plaintiff and/or doing pulmonary function studies on him, I am unable to make further statement regarding his physical condition.

Thank you for the opportunity of evaluating these records.

Sincerely,

William H. Hines, M.D., F.C.C.P.

WHH/sw
DR: 11/8/12
DT: 11/8/12

BOBBY JINDAL
Governor
Secretary

JAMES M. Le Bl

# State of Louisiana

Department of Public Safety and Corrections
Louisiana State Penitentiary

## STATE OF LOUISIANA
## WEST FELICIANA PARISH
## ANGOLA, LOUISIANA

I hereby certify that the attached documents are TRUE AND CORRECT COPIES of the original documents maintained at the Louisiana State Penitentiary.

Chemical Agent Logbook for Tiger 1 & 2 the date of 8/21/2011

*Connie McCann*

Connie McCann #77912
Ex-Officio Notary
Department of Public Safety & Corrections/LSP

Date: 11/15/12

STATE'S
EXHIBIT
D

Raymond Fobbs vs. Daniel Davis

134

OFFICER NAME: _____    SHIFT _____

DATE: _____

| TIME | | | OFFICER ENTRY |
|------|---|---|---|
| 8-21-11 | B team | A.m. | |
| | Can 1 | 84g | 8 sticks & 1 mallet |
| | Ca 2 | 94g | |
| | Ca 3 | 134g | |
| | | | |
| | | | |
| 8-21-11 | B team | P.m. | |
| | Can 1 | 84g | 8 sticks & 1 mallet |
| | Ca 2 | 94g | |
| | Ca 3 | 134g | |
| | | | |

Issued offender R. Tob's for refusing to come out of his cloths to be searched after being placed in admin segregation by Capt Sanders.
Can 2 = 94g

| 8-21-11 | D-Team | | |
|---------|--------|----|----|
| | Can 1 | 92g | 8 sticks & 1 Mallet |
| | Can 2 | 44g | |
| | Can 3 | 138g | Lt K. Cavalier |
| | | | |
| 8-22-11 | D-Team | | |
| | Can 1 | 92g | 8 Sticks & 1 Mallet |
| | Can 2 | 44g | |
| | Can 3 | 138g | Lt. K. Cavalier |
| | | | |
| 8-22-11 | A-Team | | |
| | Can 1 | 92g | 8 Sticks 1 mallet |
| | Can 2 | 44g | Lt H Brown |
| | Can 3 | 138g | |

BOBBY JINDAL
Governor
Secretary

JAMES M. Le Bı

# State of Louisiana
### Department of Public Safety and Corrections
### Louisiana State Penitentiary

STATE OF LOUISIANA
WEST FELICIANA PARISH
ANGOLA, LOUISIANA

I hereby certify that the attached documents are TRUE AND CORRECT COPIES of the original documents maintained at the Louisiana State Penitentiary.

Depart. Reg. No. C-02-006 Use of Force

Effective for the date of 8/21/2011

_Connie McCann_

Connie McCann #77912
Ex-Officio Notary
Department of Public Safety & Corrections/LSP

Date: 11 / 15 / 12

Raymond Fobbs vs. Daniel Davis



STATE'S
EXHIBIT
F

Louisiana State Penitentiary • Angola, Louisiana 70712-9813 • (225) 655-4411 • Fax (225) 655-2319
www.doc.la.gov
An Equal Opportunity Employer

STATE OF LOUISIANA
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES

Department Regulation
No. C-02-006



20 December 2010

FIELD OPERATIONS
Security
Use of Force

1.   **AUTHORITY:** Secretary of the Department of Public Safety and Corrections as contained in Chapter 9 of Title 36 and C.Cr.P. Art. 227.1.

2.   **REFERENCES:** Bailey v. Turner, 736 F.2d 963 (U.S. 4th Cir. 1984); Soto v. Dickey, 36 Cr.L 2068 (U.S. 7th Cir. 1984); Beard v. Stephens, 372 F. 2d 685 (5th Cir. 1967); In re : Riddle, 57 Cal. 2d 843, 372 P. 2d 304 (1962); ACA Model Use of Force Policy; ACA Standards 4-4090 through 4-4092, 4-4173, 4-4190, 4-4191, 4-4199, 4-4201 through 4-4206 and 4-4405 (Adult Correctional Institutions); Department Regulation Nos. B-06-001 "Health Care," C-01-008 "Firearms and Weaponry Training," C-01-016 "Canine Units," C-02-006A "Use of TASER®," C-03-003 "Escorted Absences," C-05-001 "Activity Reports/Unusual Occurrence Reports Operational Units" and C-05-001A "Serious Unusual Occurrence Review Panel."

3.   **PURPOSE:** To provide guidelines in accordance with acceptable law enforcement practices to govern the use of force and its limitations and to describe prohibited activities. This regulation is not designed to discourage employees from using force when it is necessary, but to assist them in acting reasonably when confronted with situations requiring the use of force.

4.   **APPLICABILITY:** Deputy Secretary, Chief of Operations, Regional Wardens and Wardens. Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this regulation.

5.   **POLICY:** It is the Secretary's policy that all reasonable steps are to be taken to minimize situations requiring the use of force by staff against offenders and to minimize the amount of force used in those situations. It is recognized, however, that force may be necessary to accomplish the mission and goals of the Department to provide for public safety, staff and offender safety and the maintenance of stability within the institutions.

Each unit shall define specific written procedures based on the force continuum to govern the application methods for each type of weapon (refer to attached Weapons

Department Regulation No. C-02-006
20 December 2010
Page Two

List) in accordance with the guidelines established by this regulation and the specific circumstances for which each weapon shall be utilized.

6.    DEFINITIONS:

A.    **Electronic Muscular Disruption (EMD) Device:** A device that utilizes electro-muscular disruption technology that disrupts the body's ability to communicate messages from the brain to the muscles, causing motor skill dysfunction. For the purpose of this regulation, EMD's include only the electronic capture shield and electronic restraint belt system. (The TASER® is also considered an EMD; however, refer to Department Regulation No. C-02-006A "Use of TASER®" for specific procedures regarding use of the TASER®.)

B.    **Excessive Force:** Force is excessive when the resulting application of force is inappropriate to the circumstances either during an incident or in the aftermath of an incident.

C.    **Force:** The application of a technique, action or device to compel a change in the actions of another person, which usually will result in compliance with a desired behavior, submission to authority or to deescalate a threatening behavior.

D.    **Force Continuum:** Broad categories of force, in identifiable escalating/de-escalating stages of intensity, in response to an individual's actions. The categories are commonly identified as officer presence, verbal direction or command, soft empty-hand control, hand-held chemical spray or EMD devices, hard empty-hand control, batons and firearms. An individual's actions may be defined in broad categories including full compliance to commands, verbal uncooperativeness, passive resistance, active resistance, active aggression and aggravated active aggression (lethal force.)

E.    **Less Lethal Force:** Defensive techniques or weapons that do not normally nor are intended, when properly applied, to cause death or serious bodily injury.

F.    **Less Lethal Weapons:** Weapons designed to reduce the potential of causing serious physical injury or death. Use is restricted to situations where higher levels of force are unnecessary and lesser levels are inappropriate or ineffective. Less lethal weapons include:

   1)    **Chemical Agents and Munitions:** Tear gas, mace spray or irritant dusts are chemical agents that cause irritation to the eyes, skin or respiratory system. Chemicals may be administered directly through a hand-held aerosol spray or at longer ranges by being fired or dispersed out of a launcher.

Department Regulation No. C-02-006
20 December 2010
Page Three

     2)     **Intermediate/Impact Weapons:** Examples include batons and shields which are available options in the force continuum.

G.    **Lethal Force:** Any use of force reasonably calculated in the manner used to produce death or serious bodily injury.

H.    **Lethal Weapons:** Any weapon reasonably calculated in the manner used, to produce death or serious bodily injury.

I.    **Necessary Force:** Force used when all other options have been exhausted, unavailable or are not feasible.

J.    **Reasonable Force:** Only that force which is reasonable and necessary under the particular circumstances to protect the public, staff, offenders, or others from bodily injury or only after other reasonable alternatives have been exhausted or it is determined that such alternative action(s) would be ineffective under the circumstances.

K.    **Restraints:** Mechanical, electronic or other devices used in the force continuum to aid in the restriction of an individual's bodily movement for security purposes. (See Health Care Policy No. HC-29 "Utilization of Restraints for Medical and Mental Health Management Orders" for information concerning the use of restraints for medical and mental health purposes.)

L.    **Severe Mental Health Illness:** A chronic or acute mental illness that impairs the offender's ability to maintain safety of self and others and maintain activities of daily functioning.

M.    **Severely Developmentally Delayed:** An intellectual disability that impairs the offender's ability to provide self care or maintain their safety. In addition, this type of impairment may render the offender vulnerable to victimization by others.

Note: See the attached Weapons List for items authorized in Sections 6.A., F., H. and K.

7.    **TRAINING:**

A.    All Correctional Officers and other appropriate employees shall be provided a copy of the current use of force policy and thoroughly trained pursuant to Department Regulation No. C-01-008 "Firearms and Weaponry Training" before being authorized to carry any weapon. Authorized employees shall be instructed in accordance with the regulation, including its policies and

Department Regulation No. C-02-006
20 December 2010
Page Four

procedures, and shall be provided with necessary training and retraining at least annually. Employees shall adhere to the principles and practices of the regulation during departmentally approved training.

B.  Probation and Parole Officers shall be trained in and shall adhere to the Division of Probation and Parole's Firearms Training Policy No. 402 "Use of Firearms and Certification to Carry" and Chapter 7 of the Probation and Parole Officer's Manual "Arrest, Transportation, Use of Force and Firearms."

C.  Only those authorized employees who have successfully completed specialized training and/or qualification in the operation and use of less lethal and/or lethal weapons may use such weapons.

D.  All Correctional and Probation and Parole Officers shall be trained in approved methods of self-defense and the use of force continuum.

8.  **REPORTING REQUIREMENTS:**

A.  All situations involving the use of force as outlined in this regulation shall be submitted to the Warden in writing. All written reports shall be prepared and submitted to the Warden as soon as possible after the incident, but no later than the conclusion of the tour of duty and shall be reviewed by the Warden or designee.

NOTE: This review does not include incidents where mechanical restraints are applied to an offender in a calm, non-hostile situation where no other use of force was required, i.e., instructing an offender to allow an officer to apply handcuffs in order to be escorted to the cell block following a rule violation.

B.  The Warden or designee shall investigate all allegations of improper use of force and shall notify other authorities, as appropriate.

C.  Reporting in accordance with Department Regulation No. C-05-001 "Activity Reports/Unusual Occurrence Reports Operational Units" is required.

D.  Administrative review of use of force incidents shall be conducted in accordance with the provisions of Department Regulation Nos. C-01-008 "Firearms and Weaponry Training" and C-05-001A "Serious Unusual Occurrence Review Panel."

9.  **USE OF FORCE GUIDELINES:**

A.  General Considerations

Department Regulation No. C-02-006
20 December 2010
Page Five

    1)    The use of any type of force for punishment or reprisal is strictly prohibited.

    2)    Whenever possible, the determination to use force shall be made by the highest-ranking supervisor in the immediate area.

    3)    Whenever possible, force shall not be used against offenders with severe mental health illness (SMHI) or who are severely developmentally delayed (SDD) before appropriate medical or mental health personnel can be called to the scene. The unit's Mental Health Director shall be responsible for maintaining a list of the offenders with SMHI or SDD which shall be updated on a weekly basis or more often, if needed. This list shall be easily accessible to supervisory staff for use when needed.

    4)    Reasonable steps shall be taken to minimize the amount of force used.

B.    Elements to Consider in the Review of Use of Force Incidents

    1)    The extent of the injury suffered.

    2)    The need for the application of force.

    3)    The relationship between the need and the amount of force used.

    4)    The threat reasonably perceived by the responsible supervisor

    5)    Any efforts made to temper the severity of a forceful response.

C.    For Use of Less Lethal Force

    1)    Less lethal force is force which normally causes neither death nor serious bodily injury.

    2)    Physical force, chemical agents, EMDs, intermediate/impact weapons or less lethal ammunition and devices may be used only in the following instances:

        a.    Prior to use of lethal force:

            i)    To prevent the commission of a felony, including escape;

            ii)    To prevent an act which could result in death or serious bodily injury to one's self or another person.

Department Regulation No. C-02-006
20 December 2010
Page Six

    b.    To defend one's self or others against any physical assault;

    c.    To gain offender compliance when other less lethal force options within the force continuum have failed, are clearly inappropriate, and /or ineffective;

    d.    To prevent the commission of a misdemeanor;

    e.    To prevent serious damage to property;

    f.    To enforce institutional rules;

    g.    To prevent or quell a riot.

D.    For Use of Lethal Force

    1)    Lethal force is force that in the manner used, is capable of causing death or serious bodily injury.

    2)    It may be used only as a last resort and then only in the following instances:

        a.    To prevent the commission of a felony, including escape;

        b.    To prevent an act, which could result in death or serious bodily injury to one's self or another person.

E.    For use of the following:

    1)    **Mechanical and Flex Cuff Restraints** (See Section 10. below);

    2)    **Extreme Restraints (i.e., utilization of restraint chairs, four/five point restraints and strait jackets)** (See Section 11. below);

    3)    **Chemical Agents, Intermediate/Impact Weapons and Other Less Lethal Weapons** (See Section 12. below);

    4)    **Electronic Muscular Disruption Devices (EMD's)** (See Section 13. below);

    5)    **Lethal Weapons** (Section 14. below);

    6)    **Miscellaneous (i.e., pressurized water hoses and canine units)** (See Section 15. below.)

Department Regulation No. C-02-006
20 December 2010
Page Seven

10.   SECURITY UTILIZATION OF MECHANICAL AND FLEX CUFF RESTRAINTS

   A.   When defining the specific written procedures governing application methods for each type of restraint as required in Section 5., the purpose shall be to minimize the possibility of injury to staff and maximize the effectiveness of the restraint device.

   B.   Mechanical and/or flex cuff restraints shall never be used in the following ways:

      1)   As a method of punishment;

      2)   In a way that causes undue physical discomfort, inflicts unnecessary physical pain, or restricts the blood circulation or breathing of the offender;

      3)   For periods of time longer than justified under the circumstances;

      4)   Restraints shall never be used around the head or neck of an offender.

   C.   Mechanical and/or flex cuff restraints may be used when reasonably necessary, including the following instances:

      1)   In transporting or moving an offender within or outside of the institution in accordance with institutional procedure;

      2)   When the past history and/or present behavior of the offender creates the possibility of bodily harm to any person, property damage or escape. Use of restraints in these circumstances shall be approved by a designated supervisor and be in accordance with institutional procedure. Such approval shall be obtained in advance, if possible.   (See Department Regulation No. C-03-003 "Escorted Absences" for additional information.)

   D.   After mechanical or flex cuff restraints are applied, offenders restrained in a prone (face-down) position shall remain under constant and uninterrupted visual observation due to the risk of positional asphyxia.  As soon as the condition requiring the utilization of restraints has been brought under control, the offender shall then be placed in an alternate position, preferably seated or upright to avoid breathing distress.

   E.   Refer to Health Care Policy No. HC-29 "Utilization of Restraints for Medical and Mental Health Management Orders" and Health Care Policy No. HC-38 "Suicide Prevention, Suicide Intervention and Post Suicide Management" for additional information on the use of mechanical restraints and/or flex cuff restraints.

Department Regulation No. C-02-006
20 December 2010
Page Eight

F.    Restraint management of pregnant offenders shall be in accordance with Health Care Policy No. HC-08 "Pregnancy Management" as follows:

    1)    Pregnant offenders will never be handcuffed behind the back or restrained utilizing leg irons. The electronic restraint belt shall never be used on a pregnant offender.

    2)    In cases where pregnancy is not visually obvious, offenders will be restrained utilizing handcuffs and waist chain.

    3)    In cases where pregnancy if visually obvious, offenders will be restrained utilizing only handcuffs.

    4)    Restraints shall not be utilized during labor or delivery. After the offender is moved from the Labor and Delivery unit, restraints will be applied in accordance with sit down procedures unless a Medical Authority orders flexible restraints.

11.    **EXTREME RESTRAINTS (i.e., UTILIZATION OF RESTRAINT CHAIRS, FOUR/FIVE POINT RESTRAINTS AND STRAITJACKETS):**

    A.    General

        1)    Extreme restraints shall never be used in the following ways:

            a.    As a method of punishment;

            b.    In a way that causes undue physical discomfort, inflicts unnecessary physical pain or restricts the blood circulation or breathing of the offender;

            c.    For periods of time longer than justified under the circumstances.

        2)    Extreme restraints may be utilized only when reasonably necessary for medical/mental health purposes or for security purposes and in accordance with the procedures of this Section.

        3)    Authority for the initial utilization of extreme restraints pursuant to this Section must be given by the Warden or designee (who must be a Unit Manager or above.)

        4)    Unit extreme restraint procedures developed for medical/mental health purposes pursuant to the provisions of this Section shall include approval from the unit's Health Authority.

Department Regulation No. C-02-006
20 December 2010
Page Nine

B.    Procedures for Medical/Mental Health Purposes

The unit's Health Authority or designee shall be notified to assess the offender's medical/mental health condition and shall then advise whether, on the basis of serious danger to self or others, the offender should be placed under medical/mental health supervision and if there exists a medical/mental health necessity for the continued use of extreme restraints. Should it be determined that a medical/mental health emergency requiring extreme restraints does exist, Health Care Policy No. HC-29 "Utilization of Restraints for Medical and Mental Health Management Orders" and Health Care Policy No. HC-38 "Suicide Prevention, Suicide Intervention and Post Suicide Management" shall be followed.

C.    Procedures for Security Purposes

When the unit's Health Authority or designee (or after initial approval of the Warden or designee) does not find any medical/mental health contraindication that an offender is to be placed in the restraint chair, four/five point restraints or straitjacket, the offender shall be placed in a camera observation cell (if available.) If a camera observation cell is not available, direct complete visual observation of the offender must be continuous until the initial medical/mental health assessment is completed and should continue at no greater than fifteen minute intervals thereafter.

D.    Procedures While Restrained

1)    Medical personnel on duty shall make an initial assessment after placement of an offender in any type of extreme restraints and shall follow with assessments at least every 12 hours. This includes an assessment of the medical and mental health status of the offender to determine if modification or discontinuation of the extreme restraint is appropriate for medical or mental health reasons. The unit's Health Authority or designee must be notified of any abnormal findings.

2)    Trained staff (which may include a Correctional Officer certified in first-aid) shall examine the offender every two hours and document the presence or absence of swelling and/or discoloration of extremities, the adequacy of blood circulation and any other potential risk to the offender's health. Any abnormality should be reported immediately to the appropriate medical or mental health staff.

3)    Release from extreme restraints for toilet, sanitation and nourishment functions shall be documented and arranged at intervals no greater than

Department Regulation No. C-02-006
20 December 2010
Page Ten

every two hours. (If, after five two-hour cycles in the restraint chair, the offender cannot be released from such restraint, then he must be released from the chair and be alternatively restrained for a minimum of two hours before he is placed back in the chair.) The record shall reflect approximate consumption of solids and liquids.

E.    After Use

Upon release from extreme restraints, the offender shall be examined by qualified medical personnel.

12.    USE OF CHEMICAL AGENTS, INTERMEDIATE/IMPACT WEAPONS AND OTHER LESS LETHAL WEAPONS:

A.    Chemical agents, intermediate/impact weapons or less lethal munitions and devices shall not be used as punishment under any circumstances and may be used against an offender or a group of offenders only in the following circumstances:

1)    To quell a riot and/or prevent loss of life, serious injury to person(s) and/or extensive destruction of property;

2)    To quell a disturbance that could lead to a serious situation which may jeopardize the safety, security and good order of the institution; or

3)    To regain control of the institution or part of it.

B.    The use of chemical agents, intermediate/impact weapons or less lethal munitions and devices is considered a use of force. When used, only the minimum amount of force necessary to control the situation shall be used. Any excessive use or unauthorized use will result in disciplinary action against the employee who does so.

C.    A determination for corporate or mass use of chemical agents, intermediate/impact weapons or less lethal munitions and devices shall be made by the Warden or designee (who should be the highest ranking supervisor on duty in the immediate area.)

D.    Chemical agents, intermediate/impact weapons or less lethal munitions and devices shall not:

1)    Be used on those offenders who remain passive in their cells without causing a disturbance or becoming hostile unless the offender continuously defies orders to come to the bars of the cell.    A

Department Regulation No. C-02-006
20 December 2010
Page Eleven

determination for use under these circumstances, or against an individual offender, or a restrained offender (when the circumstances are serious enough and deemed necessary) should be made by the highest ranking supervisor on duty in the area where the incident is occurring.

2) Be used on those offenders who are incapable of responding to the commands and orders being given to them by the staff (e.g. during epileptic seizures, etc.)

3) Whenever possible under prevailing circumstances, be used against offenders assigned to an area designated as a Mental Health Treatment Unit until a qualified medical or mental health worker is present and has attempted to control the situation unless it is necessary to prevent loss of life, serious injury to person(s) or extensive property damage.

E.    After Use

1) When chemical agents, intermediate/ impact weapons or less lethal munitions and devices have been used

a.    Affected individuals shall be permitted to wash their face, eyes or other exposed skin areas, as soon as possible after the situation has been brought under control. The offender shall also be examined by qualified medical personnel.

b.    Staff may be referred to institutional medical personnel as appropriate based on the circumstances.

2) All instances in which chemical agents are used shall be reported in accordance with Section 8. of this regulation.

13.    USE OF ELECTRONIC MUSCULAR DISRUPTION DEVICES (EMD's):

A.    For the purpose of this Section, EMD's shall include only the electronic capture shield and electronic restraint belt system. (Refer to Department Regulation No. C-02-006A "Use of Taser®" for specific procedures regarding its use).

B.    EMD's shall not:

1) Be used as punishment under any circumstances;

2) Be used continuously and unjustifiably used against an offender;

(This Page dated 14 November 2012 supersedes Page Eleven dated 20 December 2010).

Department Regulation No. C-02-006
20 December 2010
Page Twelve

3)    Be used on those offenders who are incapable of responding to the commands and orders being given to them by the staff (e.g. during epileptic seizures, etc.)

4)    Be used against any individual known to have been exposed or subjected to chemical agents containing flammable substances or any other product(s) using a potentially flammable propellant until a minimum of five minutes has passed allowing for evaporation of the propellant or unless the individual has completed the de-contamination process required after such exposure;

5)    Be used around known sources of flammable gases, liquids or solids;

6)    Whenever possible under prevailing circumstances, be used against offenders assigned to an area designated as a Mental Health Treatment Unit until a qualified medical or mental health worker is present and has attempted to control the situation unless it is necessary to prevent loss of life, serious injury to person(s) or extensive property damage.

C.    EMD's may be used against an offender or a group of offenders only in the following circumstances:

1)    To quell a riot and/or prevent loss of life, serious injury to person(s) and/or extensive destruction of property;

2)    To quell a disturbance that could lead to a serious situation which may jeopardize the safety, security and good order of the institution; or

3)    To regain control of the institution or part of it.

D.    The use of EMD's is considered a use of force. When used, only the minimum amount of force necessary to control the situation shall be used. Any excessive use or unauthorized use will result in disciplinary action against the employee who does so.

E.    Electronic Capture Shield

The electronic capture shield shall not be used on those offenders who remain passive in their cells without causing a disturbance or becoming hostile unless the offender continuously defies orders to come to the bars of the cell. A determination to use the electronic capture shield under these circumstances, or against an individual offender, shall be made by the highest ranking supervisor on duty in the area where the incident is occurring.

Department Regulation No. C-02-006
20 December 2010
Page Thirteen

F.    Electronic Restraint Belt

1)    Use of the electronic restraint belt in the circumstances defined in Section 13.H.2) below shall be made by a designated supervisor and in accordance with institutional procedures.    Such approval shall be obtained in advance, if possible.

2)    The electronic restraint belt may be used when reasonably necessary, including but not limited to, the following instances:

a.    When transporting or moving an offender within or outside of the institution in accordance with institutional procedures;

b.    When transporting an offender whose medical condition is not conducive to full use of restraints;

c.    When the past history and/or present behavior of the offender creates the possibility of bodily harm to any person, property damage or escape;

d.    During court appearances when the Court issues an order that the other restraints be removed (see Department Regulation No. C-03-003 "Escorted Absences" for additional information) or other such activities where the use of restraints that are not visible or prominently observable is preferred.

3)    The electronic restraint belt should never knowingly be used on the following offenders:

a.    Pregnant females;

b.    Elderly offenders over 65 years of age;

c.    Wheelchair bound;

d.    Severely ill offenders:

i.    Cardiac:    Offenders with pacemakers or defibrillators, coronary artery disease or congestive heart failure;

ii.    Liver:    Offenders with cirrhosis and swelling of the legs or abdomen;

iii.    Kidney:    Offenders on dialysis;

Department Regulation No. C-02-006
20 December 2010
Page Fourteen

    iv.    Stroke: Offenders that have trouble ambulating and therefore, use a cane or walker;

    v.    HIV: Offenders with a CD4 count of 50 or less;

    vi.    Lung: Offenders with chronic obstructive pulmonary disease (COPD) or asthma bad enough to require more than one inhaler for treatment;

    vii.    Cancer: Offenders with a current diagnosis of cancer.

4) Except as stated in Sections 13.H.1) and 2), the electronic restraint belt may also be otherwise used at the discretion of the Warden or designee in accordance with the provisions of this Section.

G. After Use

1) When EMD's have been used, affected offender(s) that suffered the electrical shock(s) shall be examined by qualified medical personnel as soon as possible after the situation has been brought under control.

2) Staff may be referred to institutional medical personnel as appropriate based on the circumstances.

3) All instances in which EMD's are used shall be reported in accordance with Section 8. of this regulation.

14. **USE OF LETHAL WEAPONS:**

A. Lethal weapons should be utilized only as a last resort and only as authorized in accordance with Department Regulation No. C-01-008 "Firearms and Weaponry Training."

B. In the utilization of firearms, the following procedures shall be followed:

1) Verbal warning (if feasible) to cease actions;

2) Warning shot (if feasible) to ensure that the offender is absolutely aware of the seriousness and probable consequence of his actions;

IMPORTANT NOTE: The only exception of the provisions of Sections 14. B.1) and 2) would be when the circumstances require immediate action to protect life or stop an escape in progress where a verbal warning or warning shot is not

Department Regulation No. C-02-006
20 December 2010
Page Fifteen

practical. Warning shots may not be fired where it is foreseeable that a member(s) of the public may be endangered.

3) Shoot to disable (render offender incapable of continuing with action prompting use of lethal force.)

C. Departmental employees shall conduct the transportation phase of **emergency evacuations** under a use of force policy with a maximum force threshold of less lethal, unless the Correctional or Probation and Parole Officer is faced with a situation where lethal force is justified as enumerated in La. R.S. 14:20, i.e. justifiable homicide.

D. After Use

1) When a weapon has been utilized, the affected individual(s) that suffered the wound shall be examined by qualified medical personnel as soon as possible after the situation has been brought under control.

2) Staff may be referred to institutional medical personnel as appropriate based on the circumstances.

3) In accordance with Department Regulation No. C-01-008 "Firearms and Weaponry Training," a Shooting Review Panel appointed by the Secretary shall review the circumstances surrounding each incident where an offender or other person is shot by departmental staff and shall make recommendations as necessary. The meetings shall occur at least quarterly but may occur on an incident-by-incident basis at the discretion of the Chief of Operations.

4) All instances in which lethal weapons are used shall be reported in accordance with Section 8. of this regulation.

15. MISCELLANEOUS:

A. The use of pressurized water hoses to quell large group disturbances is authorized. (Note: Must have written institutional policy to utilize.)

B. Canine units are authorized for all operational units with appropriately trained staff and canines pursuant to Department Regulation No. C-01-016 "Canine Units." (Note: Must have written institutional policy to utilize.)

16. SECURITY EQUIPMENT: All security equipment shall be stored in a secure but readily accessible depository outside of offender housing and activity areas. A written record and inventory shall be maintained at each institution of all routine and

Department Regulation No. C-02-006
20 December 2010
Page Sixteen

emergency distribution of security equipment. Inventories shall be maintained and updated as necessary.


s/James M. Le Blanc
Secretary

Attachment: Weapons List

This regulation supersedes Department Regulation No. C-02-006 dated 15 November 2006.

BOBBY JINDAL
Governor
Secretary

JAMES M. Le Bl

# State of Louisiana

Department of Public Safety and Corrections
Louisiana State Penitentiary

STATE OF LOUISIANA
WEST FELICIANA PARISH
ANGOLA, LOUISIANA

I hereby certify that the attached documents are TRUE AND CORRECT

COPIES of the original documents maintained at the Louisiana State

Penitentiary.

Directive No. 09.002 Use of Force

Effective for the date of 8/21/2011

Connie Mc Cann

Connie McCann #77912
Ex-Officio Notary
Department of Public Safety & Corrections/LSP

Date: 11 15 12

STATE'S
EXHIBIT
F

Raymond Fobbs vs. Daniel Davis

| | CHAPTER: | DIRECTIVE NO. |
|---|---|---|
| June 27, 2011 | SECURITY AND CONTROL | 09.002 |
| | SUBJECT:<br>USE OF FORCE | ACA STANDARD:<br>4-4084, 4-4084-1, 4-4090-92, 4-4173, 4-4199, 4-4200-04, 4-4206, 4-4281, 4-4399, 1-CTA-3A-16, 1-CTA-3A-17, -CTA-3A-19, 1-CTA-3A-20, 1-CTA-3A-23, 1-CTA-3A-24, 1-CTA-3B-08 |
| LOUISIANA STATE PENITENTIARY | REFERENCE:<br>Department Regulation Nos.C-01-008, C-02-006, C-03-003; Penitentiary Directive Nos. 04.003, 09.007/B, 09.017, 09.021, 09.052, 13.019, 13.023,13.026 | |

PURPOSE:   To provide guidelines to govern the use of force and its limitations and to describe prohibited activities. This policy is designed to assist employees in acting reasonably when confronted with situations requiring the use of force.

APPLICABILITY:   All Louisiana State Penitentiary employees.

POLICY:   It is the policy of Louisiana State Penitentiary that all reasonable steps be taken to minimize situations requiring the use of force by staff against offenders and to minimize the amount of force used in those situations. It is recognized, however, that force may be necessary to accomplish the mission and goals of the Department to provide for public safety, staff and offender safety, and the maintenance of stability within the institution. Employees will be provided with proper training and guidance in the use of force applications.

Procedures governing the use of force include both annual qualifications for staff likely to engage in activity that may involve the use of reasonable force and necessary certification under applicable regulating statutes for employees issued firearms or other security equipment. Security equipment utilized in use of force applications shall be in accordance with Penitentiary Directive No. 09.021 and Department Regulation No. C-01-008 and C-02-006. Only approved state-issued equipment will be used in the performance of official duties.

It is further the policy of Louisiana State Penitentiary that lethal weapons, less lethal weapons, electronic muscular disruption devices and restraints be used only by employees specifically trained in their use and when all available less drastic measures fail to accomplish control in handling group disturbances and subduing individuals. Said force employed shall be proportional to the threat to which it is a response and shall cease when the resistance ceases.

DEFINITIONS:

Electronic Muscular Disruption (EMD) Device:   A device that utilizes electro-muscular disruption technology that disrupts the body's ability to communicate messages from the brain to the muscles, causing motor skill dysfunction. For the purpose of this regulation, EMD's

Penitentiary Directive No. 09.002
June 27, 2011
Page 2 of 18

include only the electronic capture shield and electronic restraint belt system. (The TASER® is also considered an EMD; however, refer to Department Regulation No. C-02-006A "Use of TASER®" for specific procedures regarding use of the TASER®.)

Excessive Force: Force is excessive when the resulting application of force is inappropriate to the circumstances either during an incident or in the aftermath of an incident.

Force: The application of a technique, action or device to compel a change in the actions of another person, which usually will result in compliance with a desired behavior, submission to authority or to deescalate a threatening behavior.

Force Continuum: Broad categories of force, in identifiable escalating/de-escalating stages of intensity, in response to an individual's actions. The categories are commonly identified as officer presence, verbal direction or command, soft empty-hand control, hand-held chemical spray or EMD devices, hard empty-hand control, batons and firearms. An individual's actions may be defined in broad categories including full compliance to commands, verbal uncooperativeness, passive resistance, active resistance, active aggression and aggravated active aggression (lethal force.)

Less Lethal Force: Defensive techniques or weapons that do not normally nor are intended, when properly applied, to cause death or serious bodily injury.

Less Lethal Weapons: Weapons designed to reduce the potential of causing serious physical injury or death. Use is restricted to situations where higher levels of force are unnecessary and lesser levels are inappropriate or ineffective. Less lethal weapons include:

1)    Chemical Agents and Munitions: Tear gas, mace spray or irritant dusts are chemical agents that cause irritation to the eyes, skin or respiratory system. Chemicals may be administered directly through a hand-held aerosol spray or at longer ranges by being fired or dispersed out of a launcher.

2)    Intermediate/Impact Weapons: Examples include batons and shields which are available options in the force continuum.

Lethal Force: Any use of force reasonably calculated in the manner used to produce death or serious bodily injury.

Lethal Weapons: Any weapon reasonably calculated in the manner used, to produce death or serious bodily injury.

Necessary Force: Force used when all other options have been exhausted, unavailable or are not feasible.

Penitentiary Directive No. 09.002
June 27, 2011
Page 3 of 18

Reasonable Force: Only that force which is reasonable and necessary under the particular circumstances to protect the public, staff, offenders, or others from bodily injury or only after other reasonable alternatives have been exhausted or it is determined that such alternative action(s) would be ineffective under the circumstances.

Restraints: Mechanical, electronic or other devices used in the force continuum to aid in the restriction of an individual's bodily movement for security purposes. (See Health Care Policy No. HC-29 "Utilization of Restraints for Medical and Mental Health Management Orders" for information concerning the use of restraints for medical and mental health purposes.)

Severe Mental Health Illness: A chronic or acute mental illness that impairs the offender's ability to maintain safety of self and others and maintain activities of daily functioning.

Severely Developmentally Delayed: An intellectual disability that impairs the offender's ability to provide self care or maintain their safety. In addition, this type of impairment may render the offender vulnerable to victimization by others.

See the attached Weapons List for items/devices/weapons authorized for use at LSP.

PROCEDURE:

A.    USE OF FORCE GUIDELINES

    1.    General Considerations:

        a.    The use of any type of force for punishment or reprisal is strictly prohibited.

        b.    Whenever possible, the determination to use force shall be made by the highest ranking supervisor in the immediate area.

        c.    Whenever possible, force shall not be used against offenders with severe mental health illness (SMHI) or who are severely developmentally delayed (SDD) before appropriate Medical or Mental Health personnel can be called to the scene. The Mental Health Director shall be responsible for maintaining a list of offenders with SMHI and SDD which shall be updated on a weekly basis or more often, if needed. This list shall be easily accessible to supervisory staff for use when needed.

        d.    Reasonable steps shall be taken to minimize the amount of force used.

Penitentiary Directive No. 09.002
June 27, 2011
Page 4 of 18

    e.    Employees will not carry security equipment on their person unless authorized by the Warden or his designee. Restraining devices may be carried by supervisory personnel while on duty. Handcuffs must be worn in an approved attachable handcuff case.

    f.    Individual units may maintain small amounts of security equipment in areas inaccessible to offenders.

    g.    Assigned trip officers shall be authorized to use chemical agents and the ASP in order to prevent an escape or to stop a disturbance while escorting offenders outside institutional grounds.

    h.    With the exception of extreme emergencies, firearms are not permitted inside a secure compound or area unless authorized by the Warden.

2.    Elements to Consider in the Review of Use of Force Incidents

    a.    The extent of the injury suffered.

    b.    The need for the application of force.

    c.    The relationship between the need and the amount of force used.

    d.    The threat reasonably perceived by the responsible supervisor

    e.    Any efforts made to temper the severity of a forceful response.

3.    For Use of Less Lethal Force:

    a.    Less lethal force is force which normally causes neither death nor serious bodily injury.

    b.    Physical force, chemical agents, EMDs, intermediate/impact weapons, or less lethal ammunitions and devices, and canine units may be used only in the following instances:

        1)    Prior to the use of lethal force:

            a)    To prevent the commission of a felony, including escape.

            b)    To prevent an act which could result in death or serious bodily injury to one's self or to another person.

Penitentiary Directive No. 09.002
June 27, 2011
Page 5 of 18

    2)     To defend one's self or others against any physical assault.

    3)     To gain offender compliance when other less lethal force options within the force continuum have failed, are clearly inappropriate and/or ineffective.

    4)     To prevent commission of a misdemeanor.

    5)     To prevent serious damage to property.

    6)     To enforce institutional rules.

    7)     To prevent or quell a riot.

c.     The amount of physical force applied shall be appropriate to the amount of resistance. Once compliance starts, escalation of force stops.

4.     For Use of Lethal Force:

a.     Lethal force is force that in the manner used, is capable of causing death or serious physical injury.

b.     It may be used only as a last resort and then only in the following instances:

    1)     To prevent the commission of a felony, including escape.

    2)     To prevent an act which could result in death or severe bodily harm to one's self or another person.

5.     For use of the following:

a.     Mechanical and Flex Cuff Restraints (see Penitentiary Directive No. 09.007/B).

b.     Extreme Restraints (see Penitentiary Directive No. 10.002).

c.     Chemical Agents, Intermediate/Impact Weapons and Other Less Lethal Weapons (see Section E below).

d.     Electronic Muscular Disruption Devices (see Section F below).

Penitentiary Directive No. 09.002
June 27, 2011
Page 6 of 18

      e.     Lethal Weapons (see Section B below).

      f.     Canine Units (see Section G below).

B.    USE OF LETHAL WEAPONS

    1.    All staff, when assigned weapons, shall use the following procedure in the prevention of escapes and in situations described in Section A, 4.

    2.    Lethal weapons should be utilized only as a last resort and only as authorized herein.

    3.    In the utilization of firearms, the following procedures shall be followed:

      a.     A verbal warning to cease actions (if feasible). In the case of an escape, this should occur when an unauthorized offender(s) gets within 10 feet of a perimeter fence.

      b.     Warning shot (if feasible) to ensure that the offender is absolutely aware of the seriousness and probable consequences of his actions.

             IMPORTANT NOTE: The only exception of the provisions in Section B, 3, a and b would be when the circumstances require immediate action to protect life or stop an escape in progress where a verbal warning or warning shot is not practical. Warning shots may not be fired where it is foreseeable that a member of the public may be endangered.

      c.     Shoot to disable (render offender incapable of continuing with action; which prompts the use of lethal force).

    4.    Officers should be aware of escape attempts via aircraft.

      a.     Officers should contact the Control Center of the approach of low flying or unauthorized aircraft.

      b.     The Control Center shall advise appropriate tower officers of any expected aircraft.

      c.     If it is suspected an escape attempt is being made by an aircraft, the officer should gather as much information as possible as to the craft's identifying markings, number of occupants and possible number of offenders involved.

Penitentiary Directive No. 09.002
June 27, 2011
Page 7 of 18

     d.     If an officer is fired upon by the aircraft or if the occupants are in the act of committing a felony, the officer may fire to protect himself, attempt to disable the craft, and to prevent its departure.

     e.     The Control Center and highest ranking officer in the area shall notify the appropriate authorities of unapproved aircraft as soon as possible.

5.     After Use

     a.     When a weapon has been utilized, the affected individual(s) that suffered the wound shall be examined by qualified medical personnel as soon as possible after the situation has been brought under control.

     b.     Staff may be referred to institutional medical personnel as appropriate based on the circumstances.

     c.     In accordance with Department Regulation No. C-01-008 "Firearms and Weaponry Training," a Shooting Review Panel appointed by the Secretary shall review the circumstances surrounding each incident where an offender or other person is shot by departmental staff and shall make recommendations as necessary. The meetings shall occur at least quarterly but may occur on an incident-by-incident basis at the discretion of the Chief of Operations.

     d.     All instances in which lethal weapons are used shall be reported in accordance with Section F of this regulation.

6.     Armed Duty Post

     a.     With the exception of those offenders being transported outside the institution, armed duty posts shall be positioned in areas inaccessible to offenders. Armed guards shall position themselves at a minimum of seventy-five (75) feet from all offenders.

     b.     Armed escorts should exercise extreme caution during any movement of offenders in the course of outside trips and farm line operations. Mass movement of offenders from a security perimeter to another area requires armed escorts during hours of darkness or at time designated by the Warden.

     c.     Offenders are not allowed in the Armory or in areas where officers receive and/or return security equipment.

Penitentiary Directive No. 09.002
June 27, 2011
Page 8 of 18

C.  USE OF CHEMICAL AGENTS, INTERMEDIATE/IMPACT WEAPONS, EMD's AND OTHER LESS LETHAL WEAPONS

1.  Chemical agents, intermediate/impact weapons, or less lethal munitions and devices shall not be used as punishment under any circumstances and may be used against an offender or a group of offenders only in the following circumstances:

a.  To quell a riot and/or prevent loss of life, serious injury to person(s), and/or extensive destruction of property,

b.  To quell a disturbance that could lead to a serious situation which may jeopardize the safety, security and good order of the institution, or

c.  To regain control of the institution or a part of it.

2.  The use of chemical agents, intermediate/impact weapons or less lethal munitions and devices is considered a use of force.  When used, only the minimum amount of force necessary to control the situation shall be used.  Any excessive use or unauthorized use will result in disciplinary action against the employee who does so.

3.  A determination for corporate or mass use of chemical agents, intermediate/impact weapons or less lethal munitions and devices shall be made by the Warden or designee. (who should be the highest ranking supervisor on duty in the immediate area where the incident is occurring).

If the electronic capture shield (EMD) is to be used, the highest ranking official on duty in the immediate area where the incident is occurring will designate the officer who will use the shield. Only officers who have been trained in the proper use of the electronic capture shield may be designated to use the shield.

4.  Chemical agents, intermediate/impact weapons, EMD's or less lethal munitions and devices shall not:

a.  Be used on those offenders who remain passive in their cells without causing a disturbance or becoming hostile unless the offender continuously defies orders to come to the bars of the cell. A determination for use under these circumstances, or against an individual offender shall be made by the highest ranking supervisor on duty in the area.

Penitentiary Directive No. 09.002
June 27, 2011
Page 9 of 18

b.  Be used on those offenders who are incapable of responding to the commands and orders being given to them by staff (e.g., during epileptic seizures, etc.).

c.  Whenever possible under prevailing circumstances, be used against an offender who is assigned to a Mental Health Treatment Unit until a qualified medical or mental health worker is present and attempted to control the situation, unless it is necessary to prevent loss of life, serious injury to person(s), or extensive property damage.

   1)  The medical or mental health worker must respond, assess, and attempt an intervention prior to the use of a chemical agent or the Cell Entry Team.

   2)  If the intervention is not successful, the medical or mental health worker may authorize the use of chemical agents or the Cell Entry Team.

   3)  In such cases the medical or mental health worker will remain present at the head of the tier to monitor the offender's behavior during the use of chemical agents or Cell Entry Team.

   4)  The medical or mental health worker will document the assessment and the success or failure of the intervention, time of incident, and follow-up treatment.

   5)  When immediate action is required, consultation between Mental Health Clinician and the Medical Director will occur as soon as reasonably possible but no later than 72 hours to review the appropriateness of the action.

5.  When an offender or offenders are creating a disturbance, the officer on duty will attempt to handle the problem by ordering the offender(s) to cease the disturbance. If the offender(s) refuses and continues the disruptive behavior, the officer will then call his supervisor.

6.  When the supervisor arrives, he will take charge of the situation and then order the offender(s) to cease the disturbance. If the offender(s) refuses the order, he will then order the offender(s) to come to the bars so that he may be properly restrained and removed from his cell to be placed in administrative segregation or the appropriate area. This procedure also applies to offenders already housed in administrative segregation.

Penitentiary Directive No. 09.002
June 27, 2011
Page 10 of 18

7.  If these efforts fail to control the situation and the offender(s) continues the disruptive behavior which, in the opinion of the highest ranking security supervisor on duty in the immediate area where the incident is occurring, may lead to loss of life, serious injury to person(s), extensive destruction of property, or a serious situation which may jeopardize the safety, security and good order of the facility, the supervisor may then use only the minimum amount chemical agent necessary to subdue the offender(s).

8.  If the highest ranking security supervisor on duty in the immediate area where the incident is occurring determines that chemical agent will be used, he will personally apply the chemical agent. Only the minimum amount necessary to control the situation will be used. It is the supervisor's responsibility to ensure that the chemical agent is not used as a form of punishment or on an offender(s) who is physically incapable of responding to commands being given to him.

9.  The offender(s) will then be given orders to come to the bars to be handcuffed. If the offender complies, appropriate restraints will be applied; he will be removed from the cell and offered a change of clothing and to shower. The offender(s) and affected staff will then be examined and treated, per established protocols, by an EMT or other qualified health care provider.

10. In the event that the use of chemical agent has no effect in controlling the situation as described above, the Control Center will be notified to assemble a cell entry team to subdue the offender(s).

11. The cell entry team leader will verbally inform the offender that the EMD will be used to subdue him.

12. The cell entry team leader or another trained officer designated by the team leader will arc/test the EMD in the offender's presence to show that electricity is being used. The team leader will again give the offender the opportunity to come to the bars to be restrained.

13. If the offender still refuses to come to the bars to be restrained, the team leader in charge of the situation will utilize the EMD and riot helmet, or designate another qualified officer to do the same. The on/off switch will be placed in the "on" position, and the cell entry team will enter the cell.

14. After the team has entered the cell, the officer utilizing the EMD and riot helmet will approach the offender and place the shield upon him. Always use the minimum force necessary to control the situation.

Penitentiary Directive No. 09.002
June 27, 2011
Page 11 of 18

15.  After the burst of electricity from the EMD has been administered, maintain cover with the shield. Have the offender move or physically move the offender to be restrained. If the offender physically resists, another burst of electricity may be applied with the electronic device. While the offender is being restrained, maintain cover with the shield. This procedure may be repeated only if necessary. The offender(s) will then be examined and treated, per established protocols, by an EMT or other qualified health care provider. Only minimum force will be used.

16.  The only person authorized to use chemical agent or to order the cell to be entered to subdue an offender(s) is the highest ranking security supervisor on duty in the immediate area where the incident is occurring. Under no circumstances will an officer or officers use chemical agents, intermediate/impact weapons, or less lethal munitions and devices to subdue an offender(s) without the supervisor being present.

17.  ASP

   a.  On approval by the Warden, security supervisors of segregated areas shall be authorized to use the ASP (expandable tactical baton) in the performance of assigned duties. The ASP shall be stored in a proper storage compartment until such time as use is required. The ASP shall be inventoried.

   b.  Trip officers shall be authorized to carry the ASP while escorting offenders outside the institution. The ASP shall be signed out from the Armory as part of regular security equipment issue.

   c.  Only those staff who have been properly trained and certified shall be permitted to use the ASP.

18.  After Use

   1.  When chemical agents, intermediate/impact weapons or less lethal munitions and devices have been used

      a.  Affected individuals will be permitted to wash their face, eyes or other exposed skin areas, as soon as possible after the situation has been brought under control, and the individual will be examined by qualified medical personnel.

      b.  Staff may be referred to medical personnel as appropriate based on the circumstances.

Penitentiary Directive No. 09.002
June 27, 2011
Page 12 of 18

      2.     All instances in which chemical agents, intermediate/impact weapons or less lethal munitions or devices are used shall be reported in accordance with Section F.

D.    USE OF ELECTRONIC MUSCULAR DISRUPTION DEVICES (EMD's)

      1.     For the purpose of this Section, EMD's shall include only the electronic capture shield and electronic restraint belt system. (Refer to Department Regulation No. C-02-006A "Use of Taser®" for specific procedures regarding use of the Taser®.)

           The use of the electronic capture shield is authorized for use at LSP as described in Section C, 10-16.

      2.     EMD's shall not:

           a.     Be used as punishment under any circumstances;

           b.     Be used continuously and unjustifiably used against an offender;

           c.     Be used on those offenders who are incapable of responding to the commands and orders being given to them by the staff (e.g. during epileptic seizures, etc.)

           d.     Be used against any individual known to have been exposed or subjected to chemical agents containing flammable substances or any other product(s) using a potentially flammable propellant until a minimum of five minutes has passed allowing for evaporation of the propellant or unless the individual has completed the de-contamination process required after such exposure;

           e.     Be used around known sources of flammable gases, liquids or solids;

           f.     Whenever possible under prevailing circumstances, be used against offenders assigned to an area designated as a Mental Health Treatment Unit until a qualified medical or mental health worker is present and has attempted to control the situation unless it is necessary to prevent loss of life, serious injury to person(s) or extensive property damage.

      3.     EMD's may be used against an offender or a group of offenders only in the following circumstances:

           a.     To quell a riot and/or prevent loss of life, serious injury to person(s) and/or extensive destruction of property;

Penitentiary Directive No. 09.002
June 27, 2011
Page 13 of 18

    b.    To quell a disturbance that could lead to a serious situation which may jeopardize the safety, security and good order of the institution; or

    c.    To regain control of the institution or part of it.

4.    The use of EMD's is considered a use of force. When used, only the minimum amount of force necessary to control the situation shall be used. Any excessive use or unauthorized use will result in disciplinary action against the employee who does so.

5.    Electronic Capture Shield

The electronic capture shield shall not be used on those offenders who remain passive in their cells without causing a disturbance or becoming hostile unless the offender continuously defies orders to come to the bars of the cell. A determination to use the electronic capture shield under these circumstances, or against an individual offender, shall be made by the highest ranking supervisor on duty in the area where the incident is occurring.

6.    Electronic Restraint Belt

    a.    Use of the electronic restraint belt shall be made by a designated supervisor and may be used in accordance with Penitentiary Directive No. 09.017, Transportation of Offenders. Such approval shall be obtained in advance, if possible.

        1)    When transporting or moving an offender within or outside of the institution in accordance with institutional procedures;

        2)    When transporting an offender whose medical condition is not conducive to full use of restraints;

        3)    When the past history and/or present behavior of the offender creates the possibility of bodily harm to any person, property damage or escape;

        4)    During court appearances when the Court issues an order that the other restraints be removed (see Department Regulation No. C-03-003 "Escorted Absences" for additional information) or other such activities where the use of restraints that are not visible or prominently observable is preferred.

    b.    The Medical Director or his designee should be consulted to be medical clearance for electronic restraint belt use and the electronic restraint belt should never knowingly be used on the following offenders:

Penitentiary Directive No. 09.002
June 27, 2011
Page 14 of 18

      1)     Elderly offenders over 65 years of age;

      2)     Wheelchair bound;

      3)     Severely ill offenders:

            a)     Cardiac: Offenders with pacemakers or defibrillators, coronary artery disease or congestive heart failure;

            b)     Liver: Offenders with cirrhosis and swelling of the legs or abdomen;

            c)     Kidney: Offenders on dialysis;

            d)     Stroke: Offenders that have trouble ambulating and therefore, use a cane or walker;

            e)     HIV: Offenders with a CD4 count of 50 or less;

            f)     Lung: Offenders with chronic obstructive pulmonary disease (COPD) or asthma bad enough to require more than one inhaler for treatment;

            g)     Cancer: Offenders with a current diagnosis of cancer.

d.     Except as stated in D, 6, b the electronic restraint belt may also be otherwise used at the discretion of the Warden or designee in accordance with the provisions of this Section.

e.     After Use

      1)     When EMD's have been used, affected offender(s) that suffered the electrical shock(s) shall be examined by qualified medical personnel as soon as possible after the situation has been brought under control.

      2)     Staff may be referred to institutional medical personnel as appropriate based on the circumstances.

      3)     All instances in which EMD's are used shall be reported in accordance with Section F of this regulation.

Penitentiary Directive No. 09.002
June 27, 2011
Page 15 of 18

E.    CANINE UNITS

Canine units shall be available to conduct building searches for offenders, to assist in escape procedures, to protect officers and others from serious bodily injury and death, to control crowds/riots, and to detect the presence of concealed contraband.

1.    The Warden or his designee shall be responsible for determining whether a situation justifies canine use and appropriate tactical measures that should be taken.

2.    Canines shall not be handled or given commands by anyone other than the assigned handler and/or his alternate.

3.    Unless otherwise approved by the Warden or his designee, canines shall be used in a leashed condition at all times.

4.    Canines may be used between the fences to provide perimeter security, when deemed necessary by the Warden or his designee. In the event that canines are utilized in providing perimeter security, one officer will provide roving security.

F.    REPORTING REQUIREMENTS

1.    All situations involving the use of force, including the discharge of any firearms, use of chemical agents and use of other security equipment (except for training purposes) must be documented to establish the identity of personnel and offenders involved and to describe the nature of the incident. In reporting instances, the standard Unusual Occurrence Report (UOR) shall be submitted to the Warden or designee as soon as possible after the incident, but no later than the end of tour of duty and shall be reviewed by the Warden or designee. Each time the electronic device is used the Armory will provide a Use of Electronic Device Documentation (Form 09.002-A) to be completed and forwarded to the appropriate areas.

NOTE: This review does not include incidents where mechanical restraints are applied to an offender in a calm, non-hostile situation where no other use of force was required, i.e., instructing an offender to allow an officer to apply handcuffs in order to be escorted to the cell block following a rule violation.

2.    The Warden or designee shall investigate all allegations of improper use of force and shall notify other authorities, as appropriate.

3.    Reporting in accordance with Department Regulation No. C-05-001 "Activity Reports/Unusual Occurrence Reports Operational Units" is required.

Penitentiary Directive No. 09.002
May 7, 2012
Page 16 of 18

4.    Administrative review of use of force incidents shall be conducted in accordance with the provisions of Department Regulation Nos. C-01-008 "Firearms and Weaponry Training" and C-05-001A "Serious Unusual Occurrence Review Panel."

G.    EXAMINATION BY MEDICAL STAFF

As soon as possible after a situation has been brought under control through the use of force, the offender involved shall be examined by qualified medical personnel. Staff may be referred to institutional medical personnel as appropriate based on the circumstances.

H.    SECURITY EQUIPMENT – ACCESS, STORAGE AND INVENTORY

1.    The Armory is responsible for the maintenance and distribution of security equipment to all units, except canine units. Only personnel designated by the Assistant Warden IV/Security shall have access to the Armory's security equipment storage area. The Armory is responsible for the issuance of security equipment to authorized personnel for the performance of official duties, e.g., field officers, trip officers, roving security, tower officers, tactical unit personnel and chase team personnel. Any other issuance of security equipment shall be at the discretion of the Warden or his designee.

2.    The Armory shall issue security equipment to authorized personnel such as shift supervisors and senior security officers of designated areas for use within the institution. Issuance of these items shall be documented by the issuing officers and signed by the receiving officer.

3.    The Armory shall maintain an inventory of all weapons, ammunition, chemical agents, and related security devices. A written record will be maintained by Armory personnel regarding the issuance of any equipment in order to determine accountability and responsibility. This report, which will be submitted to the Assistant Warden IV/Security at least monthly, will detail weapon conditions and list expiration dates of other equipment.

4.    At the beginning of each shift, Armory personnel will perform a test of the electronic devices. The results of the tests will be documented. If the electronic device fails the test, the Armory officer will notify the Communications Department to arrange for repairs.

5.    Cellblock units will store chemical agents in a locked cabinet. Chemical agents stored in the cabinet will be inventoried daily. At the beginning and the end of the shift, the Cellblock supervisor will log the weight of each can in the logbook.

6.    In the event that chemical agents are used, the name and number of the offender the agent was used on will also need to be logged in the logbook. The can will be weighed after the incident and the new weight noted in the logbook.

7.    It is the responsibility of each respective Assistant Warden to ensure that expired agents and empty cans are sent to the Armory for replacement.

**THIS PAGE SUPERSEDES PAGE 16 DATED JUNE 27, 2011.**

Penitentiary Directive No. 09.002
June 27, 2011
Page 17 of 18

H.    LAW ENFORCEMENT/VISITOR WEAPONS

1.    Unless authorized by the Warden, law enforcement officers and visitors are not permitted to carry their firearms inside the confines of the prison.

2.    Perimeter gate security personnel will secure weapons in a secure storage locker and issue receipts to the owners of the weapons.

I.    ABUSE OF OFFENDERS, CORPORAL PUNISHMENT, OR USE OF UNNECESSARY OR EXCESSIVE FORCE

1.    No employee shall abuse an offender for any reason. Violations are actionable under the Corrections Services Employee Manual, Employee Rules and Disciplinary Procedures.

2.    The force used shall be proportional to the threat to which it is a response and shall cease when the resistance ceases.

3.    Necessary force may include the use of physical contact, chemical agents, intermediate/impact weapons and other less lethal weapons and munitions, mechanical restraints, electric muscular disruption devices, and firearms.

4.    The following uses of force are prohibited: corporal punishment, unnecessary force, and excessive force.

J.    TRAINING

1.    All correctional officers and other appropriate employees shall be provided a copy of the current use of force policy and thoroughly trained pursuant to Department Regulation No. C-01-008 before being authorized to carry any weapon. Authorized employees shall be instructed in accordance with the regulation, including policies and procedures, and shall be provided with necessary training and retraining at least annually. Employees shall adhere to the principles and practices of the regulation during training sessions.

2.    All Corrections Security Officers will be trained in approved methods of self-defense and the use of force continuum.

3.    Only those authorized employees who have successfully completed specialized training and/or qualification in the operation and use of less lethal and/or lethal weapons may use such weapons.

Penitentiary Directive No. 09.002
June 27, 2011
Page 18 of 18

4.    All instructors authorized to train others in the use of firearms, use of chemical agents, and use of force are certified by a competent authority to conduct such training.    All chemical agent instructors must be trained in the treatment of individuals exposed to a chemical agent.

Burl Cain, CCE
Warden

Attachment:        DPS&C Weapons List

Form:              LSP-09.002-A        Use of Electronic Device Documentation

This policy supersedes Penitentiary Directive No. 09.002 dated February 22, 2008.

Department Regulation No. C-01-008 and C-02-006
20 December 2010

## WEAPONS LIST

The following weapons only are approved for purchase without authorization from the Secretary or designee.

### MECHANICAL AND FLEX CUFF RESTRAINTS
(See Section 10. of Department Regulation No. C-02-006)

### Applies to Department Regulation No. C-02-006 "Use of Force" ONLY

Legirons

Handcuffs (with standard case)

Flexcuffs

Restraint Belt with or without black box

Grip Restraint System

Side Restraints

Leather Belt Restraints

Leg and Arm Braces

Soft Wrist and Ankle Restraints

The Tube

Facial Protective Mask

### EXTREME RESTRAINTS
(See Section 11. of Department Regulation No. C-02-006)

Restraint Chair

Straightjacket

### CHEMICAL AGENTS, INTERMEDIATE IMPACT WEAPONS AND OTHER LESS LETHAL WEAPONS
(See Section 12. of Department Regulation No. C-02-006)

1.   Chemical Aerosols

Capstun - OC

Department Regulation Nos. C-01-008 and C-02-006
20 December 2010
Page Two

Deep Freeze – OC/CS

Freeze +P – OC/CS

Clear Out – OC/CS

Punch II - OC

Body Guard - OC

Sabre Red - OC

Fox 5.3 - OC

First Defense HV Stream – OC

2.  **Chemical Grenades**

HC Smoke/CN/CS

CN/CS Rubber Ball

CN/CS/OC Blast Dispersion

3.  **Chemical Projectiles (HC, CN, CS)**

Short/long range

Blast/Muzzle dispersion

Barricade Flight/Skate Shell - Deleted 11/15/06 - May Utilize Existing Inventory Only

Barricade Penetrating Round

Flite Rite - Deleted 11/15/06 - May Utilize Existing Inventory Only

Skat Shell

Stinger cartridge and product - Deleted 4/20/99 - May Utilize Existing Inventory Only

TKO Fragible Slug - Deleted 11/15/06 - May Utilize Existing Inventory Only

Door Breaching Round

Department Regulation Nos. C-01-008 and C-02-006
20 December 2010
Page Three

12 Gauge Rubber Pellets – Deleted 4/20/99 – May Utilize Existing Inventory Only

Multiple Baton Shell – Deleted 4/20/99 – May Utilize Existing Inventory Only

Fogger Additives

Pepper Fogger Machine/Smoke Generator

Fox mixes/CN/CS/OC

Flush mix

Insert Screening Smoke

4.    **Chemical Agent Launching Systems and Chemical Dispersants**

Ispra Israeli gas gun and CS Irritant

Israeli Protecto-jet and Solution

37 mm Caliber: gas gun/launcher (Def Tec, Smith & Wesson, Ferret, Federal and Penn Arms)

1.5 Caliber: gas gun – Deleted 11/15/06 – May Utilize Existing Inventory Only

40 mm Caliber: gas gun/launcher (Def Tec, Fed Labs, Smith & Wesson, Ferret and Federal)

5.    **Intermediate/Impact Weapons**

24" riot batons

36" riot batons

PR 24 batons

Expandable batons

Concave riot shield

Convex riot shield

Bullet Resistant Shield

Department Regulation Nos. C-01-008 and C-02-006
20 December 2010
Page Four

6.    Other Less Lethal Weapons

Stinger Grenade, Rubber Pellet and Rubber Pellet Combo CS (Mandatory)

12 Gauge Projectiles (Low Velocity Rubber Pellet and Rubber Sabot and Combo CS) (Mandatory)

Bean Bag Rounds for 12 Gauge and 37 mm Caliber (Mandatory) and 40 mm Caliber (Discretionary)

Multiple Baton Round Wood or Foam Rubber 37/38 mm Caliber (Mandatory) and 40 mm Caliber (Discretionary)

SA 200 Pepper Launcher Semi Automatic Rifle (Discretionary)

Pepperball rounds (OC powder filled, Inert powder filled, Inert liquid filled) (Discretionary)

12 Gauge Blank Launching Rounds (Discretionary)

Distraction Device (Concussion Grenade and 12 Gauge and 40 mm Caliber) (Discretionary)

Stinger Cartridges for 37/38 mm Caliber (Discretionary) and 40 mm Caliber (Discretionary)

Flexible Baton 12 Gauge close range (10 to 50 feet) (Discretionary)

Flexible Baton 37 mm Caliber and 40 mm Caliber close range (10 to 65 feet) (Discretionary)

Grab Nets (Discretionary)

Spike System (Discretionary)

Canines (Discretionary)

### ELECTRONIC MUSCULAR DISRUPTION DEVICES
(See Section 13. of Department Regulation No. C-02-006)

Electronic Capture Shield (Mandatory)

Electronic Nova RACC Restraint Belt System (Mandatory)

TASER® and cartridges (Applies to Department Regulation No. C-02-006A "Use of TASER®" ONLY)

Department Regulation Nos. C-01-008 and C-02-006
20 December 2010
Page Five

LETHAL WEAPONS
(See Section 14. of Department Regulation No. C-02-006)

1.  Handguns

.40 Caliber: Smith and Wesson, Glock, Ruger, Sig Sauer, Springfield Armory and Kimber Arms

.38 Caliber: Smith and Wesson, Colt and Ruger

.357 Caliber: Smith and Wesson, Colt, Dan Wesson and Ruger

9mm Caliber: Smith and Wesson, Glock, Ruger, Sig Sauer, Springfield Armory and Kimber Arms

.45 Caliber: Ingram Model 6, Springfield Armory and Kimber Arms

.357 Sig Caliber: Sig Sauer

(Or equivalent caliber/function as may be available on state contract under different brand names.)

2.  Rifles

.223 Caliber: Colt AR-15 SP-1, Ruger Mini-14 and Bushmaster A3 M4 Patrolman

.30 Caliber: Universal M-1 carbine

30-30 Caliber: Marlin #336C and Winchester #94 - Deleted 10/31/02 - May Utilize Existing Inventory Only

30-06 Caliber: Winchester #70 and Remington #700

.300 Caliber: Winchester #700 Magnum Caliber

.308 Caliber: Remington #700

.243 Caliber: Remington #700

9 mm Caliber, 10 mm Caliber and 40 Caliber: Heckler and Koch MP5

45 ACP Caliber: Car 45 Olympic Arms

(Or equivalent caliber/function as may be available on state contract under different brand names.)

Department Regulation Nos. C-01-008 and C-02-006
20 December 2010
Page Six

3.    Shotguns

12 gauge Winchester #1200

12 gauge Mossberg #3000

12 gauge Remington #870 and #1100

12 gauge Ithaca #37

(Or equivalent gauge/function as may be available on state contract under different brand names.)

4.    Ammunition

Appropriate ammunition may be purchased for each weapon listed herein.

LSP-09.002-A
July 2, 2004

LOUISIANA STATE PENITENTIARY
# USE OF ELECTRONIC DEVICE DOCUMENTATION

| DATE: | TIME: |
|---|---|
| OFFENDER(S) | DOC # |
| | |
| | |
| | |

| CIRCUMSTANCES REQUIRING USE OF ELECTRONIC DEVICE | |
|---|---|
| | |
| | |
| | |
| | |
| | |

| SUPERVISOR AUTHORIZING USE OF ELECTRONIC DEVICE: | |
|---|---|
| EMPLOYEE OPERATING ELECTRONIC DEVICE: | |
| OTHER EMPLOYEES ENTERING CELL: | |
| | |
| | |
| OTHER WITNESSES: | |
| | |

COMMENTS ABOUT ACTUAL USE OF ELECTRONIC DEVICE
(How many seconds used, number of times used, effects on the offender, any effects on employees, problems with the device, etc.)

EMT OR OTHER MEDICAL PERSONNEL WHO EXAMINED OFFENDER(S)
AFTER USE OF ELECTRONIC DEVICE

This form is to be completed each time the Electronic Device is used. Unusual Occurrence Reports will also be prepared and attached. Distribution of reports is to follow the same method used to distribute UORs with an additional copy going to Medical Records.

BOBBY JINDAL
Governor
Secretary

JAMES M. Le BL

# State of Louisiana
Department of Public Safety and Corrections
Louisiana State Penitentiary

## STATE OF LOUISIANA
## WEST FELICIANA PARISH
## ANGOLA, LOUISIANA

I hereby certify that the attached documents are TRUE AND CORRECT

COPIES of the original documents maintained at the Louisiana State

Penitentiary.

Directive No. 09.033 Searches of Inmates

Effective for the date of 8/21/2011

*Connie McCann*

Connie McCann #77912
Ex-Officio Notary
Department of Public Safety & Corrections/LSP

Date: 11 | 15 | 12

STATE'S
EXHIBIT
G

Raymond Fobbs vs. Daniel Davis

Louisiana State Penitentiary • Angola, Louisiana 70712-9813 • (225) 655-4411 • Fax (225) 655-2319
www.doc.la.gov
An Equal Opportunity Employer

Superseded 9/5/11

| December 15, 2008<br><br>LOUISIANA STATE PENITENTIARY | CHAPTER:<br><br>SECURITY AND CONTROL | DIRECTIVE NO.<br><br>09.003 |
|---|---|---|
| | SUBJECT:<br><br>SEARCHES OF INMATES | ACA STANDARD:<br>4-4192, 4-4193,<br>4-4194, 4-4282 |
| | REFERENCE:<br>Department Regulation No. C-02-003, C-03-007,<br>Penitentiary Directive No. 09.014, 10.005 | |

PURPOSE: To establish policy regarding searches of inmates at Louisiana State Penitentiary.

APPLICABILITY: All Louisiana State Penitentiary Wardens, Staff Physicians, Security Supervisors, and Correctional Officers.

POLICY: The United States and Louisiana constitutions prohibit unreasonable searches. It is essential to the safe operation of Louisiana State Penitentiary and the safety and welfare of all staff, visitors, and inmates at LSP that contraband shall be controlled and, insofar as possible, eliminated on facility grounds and among the inmate population. Therefore, it is the policy of LSP that frequent unannounced and irregularly timed searches of inmates, their living quarters, and other areas to which they have access shall be conducted as often as necessary to ensure safety and security. Searches should be conducted in a professional manner that avoids unnecessary force and minimizes indignity to the inmate while still accomplishing the objective of the search. Only staff trained in effective search techniques shall conduct searches.

DEFINITION:

Personal Searches:

a.  Property Search: A search of any and all of an inmate's property, including but not limited to, clothing, lockers, cells, rooms, beds, laundry bags, assigned work equipment, and work areas.

b.  Pat-Down Search (also frisk search) - A search of a fully clothed inmate for the purpose of discovering contraband. Pat down searches may be conducted by an officer of the opposite gender than the inmate and may be performed in any area of the institution and during movement periods.

    The inmate being searched may be required to empty his pockets, or any other item in his control where contraband may be stored or carried.

Penitentiary Directive No. 09.003
December 15, 2008
Page 2 of 6

The inmate being searched may also be required to remove all outerwear (coats, jackets, hats, caps, gloves, shoes, socks, etc.) in order that these items may be searched. He may be required to run his hands through his hair and open his mouth for inspection. He shall not be required to remove articles of clothing which are his basic dress (shirts, pants, etc.).

The person conducting the search shall use his hands to touch the inmate being searched, through his clothes, in such a manner to determine if something is being concealed. If the person conducting the search discovers an unusual lump, bulge, etc., he may order the inmate to disclose the source.

c.   General Search - A routine search of one or more individual inmates or a large group of inmates such as an entire tier or dormitory. Both person and property may be searched.

During a general search, inmates may be required to remove their clothing down to their underwear (shorts) in order that the clothing may be inspected for contraband and the inmate's person be visually observed. This may take place en masse, in the presence of other inmates. Inmates who claim that they are not wearing underwear will still be required to remove their basic dress.

d.   Strip Search - A visual search of an inmate's nude body, conducted by employees of the same sex as the inmate. Strip searches shall be conducted in a private place out of the view of others. The inmate may be required to bend over, squat, turn around, raise his arms, and lift the genitals. (The foregoing list is typical, not exclusive.) The inmate's clothes shall be thoroughly searched prior to being returned. Strip searches shall be conducted in a respectful and dignified manner.

e.   Visual Body Cavity Search (Strip Search with Genital Examination) - A search having the characteristics of a strip search with the addition of a visual search of the anal opening whereby the inmate being searched is required to open the cheeks of the buttocks. The inmate's clothes shall also be thoroughly searched prior to being returned to the inmate. Such searches shall be conducted by officers of the same sex as the inmate, in private and based on reasonable suspicion that the inmate is carrying contraband or other prohibited material. (Reasonable suspicion is not required when inmates return from contact with the general public or from outside the institution.)

f.   Body Cavity Search - A search of an inmate's body cavity conducted by a staff physician only.

Probable Cause: Articulable factors supported by reasonable suspicion that contraband is being concealed. Probable cause exists when facts and circumstances within the officer's

Penitentiary Directive No. 09.003
December 15, 2008
Page 3 of 6

knowledge and about which he has trustworthy information are sufficient to support a reasonable suspicion that an offense has been or will be committed and that contraband may be found at the place to be searched or on the inmate.

Reasonable Suspicion:    Suspicion supported by facts and circumstances which lead an employee of ordinary caution to believe that an inmate is concealing contraband in or on his body.  Factors to consider in determining reasonable suspicion include, but are not limited to, the following:

      a.     Nature of the tip or information.

      b.     Reliability of the informant.

      c.     Degree of corroboration of the tip or other information.

      d.     Other facts contributing to suspicion.

PROCEDURE:

A.    WHEN SEARCHES ARE PERMITTED

    1.    Property Search - May be conducted at any time.

    2.    Pat-Down Search - May be conducted at any time.

    3.    General Search - May be conducted at any time.

    4.    Strip Search - Upon approval by a Captain or higher-ranking employee in the chain of command, a routine strip search may be conducted by employees of the same sex as the inmate at any time, without the requirement of reasonable suspicion or probable cause.

        All strip searches shall be conducted by one officer and witnessed by an additional officer or staff member of the same sex.

        Strip searches shall be documented in the unit log book by the employees conducting the search.  Documentation should include the circumstances giving rise to the search (routine or other) and results of the search.   Further documentation shall be governed by the requirements of Department Regulation No. C-05-001.

    5.    Visual Body Cavity Search – A visual body cavity search may be conducted ROUTINELY, without a showing of reasonable suspicion and special documentation, under the following circumstances:

Penitentiary Directive No. 09.003
December 15, 2008
Page 4 of 6

   a.   When an inmate is entering or leaving the institution for a court appearance, trip or work detail.

   b.   Prior to and after a physical contact visit between the inmate and visiting relatives, friends, or attorneys.

   c.   When an inmate is entering or leaving a segregation area.

   d.   After unescorted contact with general population inmates by an inmate in segregation.

OTHERWISE, a visual body cavity search may be conducted only upon a specific and particular showing of reasonable suspicion, and special documentation under the following circumstances:

   a.   Prior written approval of the Warden or designee;

   b.   The search shall be conducted by one officer and witnessed by one additional officer or staff member of the same sex as the offender;

   c.   The employees conducting the search shall document the visual body cavity search in the unit log book. Documentation shall indicate the specific and particular showing of reasonable suspicion which gave rise to the search and the results of the search;

   d.   Further documentation shall be governed by the requirements of Department Regulation No. C-05-001 "Activity Reports/Unusual Occurrence Reports/ Operational Units."

6.   Body Cavity Search – A body cavity search is permitted under the following circumstances:

   a.   When a strip search creates specific and particular showing of reasonable suspicion that the inmate is concealing something within a body cavity. (For example, if the area is reddened, if a substance such as Vaseline is smeared outside the opening, or if something is bulging or protruding from the opening. If an object is protruding from the cavity.)

   b.   If a body cavity search is to be conducted, it shall be performed only by a physician. It cannot be conducted by a nurse or non-medical employee. The inmate must be searched in a sanitary manner and in a sanitary location in accordance with good medical practice. Such search should be conducted only upon written approval of the Warden, Deputy Warden, Assistant Warden/Security, or the Duty Warden. The written authorization

Penitentiary Directive No. 09.003
December 15, 2008
Page 5 of 6

may be issued following verbal orders. See Penitentiary Directive No. 10.005 for further details regarding the use of dry cell.

c.     The search shall be witnessed by two staff members of the same sex as the inmate.

d.     The physician who conducted the search and the staff members who witnessed the search shall document the body cavity search in the unit log book and medical record. Documentation shall indicate the specific and particular showing of reasonable suspicion that the inmate was concealing something within a body cavity which gave rise to the search and the results of the search.

e.     Further documentation shall be governed by the requirements of Department Regulation No. C-05-001 "Activity Reports/Unusual Occurrence Reports/Operational Units."

B.     SEARCHES BY NARCOTIC DOGS

1.     Searches of inmate's property by trained narcotic dogs may be conducted at any time as detailed in Penitentiary Directive No. 09.014.

2.     The narcotic dogs shall be utilized only by the trained handler to conduct routine or random searches of all inmates housed at LSP. This includes inmates returning to the institution from any work detail, pass, furlough or emergency leave, including but not limited to funeral trips, court orders, hospital trips, or any other activity for which the inmate is required to leave the grounds of the institution under the jurisdiction of the Department.

C.     SEARCHES

1.     Dormitory and cellblock officers shall perform a daily search of immediate area of responsibility. Officers shall randomly search as many inmates daily as possible by pat and transfrisker.

2.     Dining room officers shall conduct searches of the dining room and kitchen areas when not counting or feeding. It is essential that this area be searched daily.

3.     Officers assigned to the Education Department shall conduct searches within the Education Department. It is essential that this area be searched daily.

4.     Officers assigned to job area sites shall conduct searches of the immediate area when not checking inmates into and/or out of the area. It is essential that these areas be searched daily.

Penitentiary Directive No. 09.003
December 15, 2008
Page 6 of 6

5.    Officers assigned to visiting rooms will perform a visual body cavity search of all inmates entering and departing the visiting room.

6.    When field lines are not in operation, all officers assigned to Field Operations (Sergeants, Lieutenants and Captains) will be assigned to various areas for the purpose of conducting searches.

7.    Inmates are subject to search 24 hours a day.

8.    If an inmate is not present when his locker is inspected, all articles removed from his locker should be returned intact and the locker re-locked.

9.    Each officer is expected to prepare a Daily Unit Search/Inspection Report on each search performed. The reports are to be forwarded to the area security supervisor. NOTE: In regard to personal searches, care should be taken to include the number of inmates who were searched on each report.

10.    Good judgment should be used by all officers to avoid damaging inmate's personal property while conducting a search.

D.    DISPOSAL OF CONTRABAND

1.    Contraband or unauthorized property found during a search shall be disposed of in accordance with Department Regulation No. C-03-007.

Burl Cain, CCE
Warden

Attachment:  Daily Unit Search/Inspection Report

This policy supersedes Penitentiary Directive No. 09.003 dated March 16, 2006.

Penitentiary Directive Nos. 09.003, 09.023,    09.034

## LOUISIANA STATE PENITENTIARY
## DAILY UNIT SEARCH/INSPECTION REPORT

| DATE | | UNIT | | TEAM | | | | |
|---|---|---|---|---|---|---|---|---|

| INMATE-S NAME & #/ CELL OR BED #/AREA SEARCHED | # OF INMATES | # RANDOM SEARCHES | # TARGETED SEARCHES | CONTRABAND SEIZED | METHOD | AREA IN COMPLIANCE | SHOES NOTCHED | D B REPORT ISSUED |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

GMD - Ground Metal Detector    T - Transfrisker    VBC - Visual Body Cavity    P - Pat Search    G - General Search    V - Vehicle Search

| | | |
|---|---|---|
| List Inmate Complaints or Problems | | |
| List Maintenance Problems | | |
| Maintenance Problems Reported To | Date Reported | |
| Repaired        Yes        No | Date Repaired | |
| Beeper/Radio Tag # | Function Property        Yes        No | |
| Condition of Case | Antenna | |
| Battery | Exterior Housing | |
| Other Problems | | |

| | | | | | |
|---|---|---|---|---|---|
| Front/Rear Exit Door Checked | Yes | No | List Problems | | |
| All Windows Secure | Yes | No | List Problems | | |
| All Walls Secure | Yes | No | List Problems | | |
| All Vents Secure | Yes | No | List Problems | | |
| All Cell Bars Secure | Yes | No | List Problems | | |
| All Pipechases Secure | Yes | No | List Problems | | |
| All Cell Doors Function Properly | Yes | No | List Problems | | |
| Problems Reported to Whom | | | | | |
| Comments | | | | | |

REPORTING OFFICER:

NAME
TITLE
ASSIGNMENT:

TEAM LIEUTENANT:

NAME:
TITLE:
ASSIGNMENT:

xc    Unit Warden
Attach copy to malfunctioning radio/beeper and forward to Communications Department

Case 3:11-cv-00700-JWD-SCR    Document 66-8    12/19/12    Page 62 of 82

BOBBY JINDAL
Governor
Secretary

JAMES M. Le Bl

# State of Louisiana
Department of Public Safety and Corrections
Louisiana State Penitentiary

STATE OF LOUISIANA
WEST FELICIANA PARISH
ANGOLA, LOUISIANA

I hereby certify that the attached documents are TRUE AND CORRECT
COPIES of the original documents maintained at the Louisiana State
Penitentiary.

Depart. Reg. No. C-02-003 Searches of Offenders

Effective for the date of 8/21/2011

*Connie McCann*

Connie McCann #77912
Ex-Officio Notary
Department of Public Safety & Corrections/LSP

Date: 11/15/12

Raymond Fobbs vs. Daniel Davis

STATE'S
EXHIBIT
H

STATE OF LOUISIANA
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES

Department Regulation
No. C-02-003

12 November 2008

FIELD OPERATIONS
Security
Searches of Offenders

1.  AUTHORITY:  Secretary of the Department of Public Safety and Corrections as contained in Chapter 9 of Title 36.

2.  REFERENCES:  U.S. Constitution, 4th and 14th Amendments; Louisiana Constitution, Art. 1, Section 5; La. R.S. 14:402; La. C.Cr.P. Art. 215.2; Thorne v. Jones, 765 F. 2nd 1270 (U.S. 5th Cir. (1985); Bell v. Wolfish, 441 U.S. 520, (1979); ACA Standards 4-4192, 4-4193 and 4-4194 (Adult Correctional Institutions;) Department Regulation Nos. B-05-001 "Disciplinary Rules and Procedures for Adult Offenders," C-03-007 "Offender Personal Property List, State Issued Items, Procedures for the Reception, Transfer and Disposal of Offender Personal Belongings" and C-05-001 "Activity Reports/Unusual Occurrence Reports/Operational Units."

3.  PURPOSE:  To establish the Secretary's policy regarding searches of offenders at DPS&C facilities and to set forth the procedures to be followed when searching offenders.

4.  APPLICABILITY:  Deputy Secretary, Chief of Operations, Assistant Secretary, Regional Wardens, Wardens and Director of Probation and Parole.  Each Unit Head is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this regulation and for implementing and notifying all affected persons of its contents.

5.  POLICY:  The United States and Louisiana Constitutions prohibit unreasonable searches. It is essential to the safe operation of all DPS&C facilities and the safety and welfare of all staff, visitors and offenders at those facilities that contraband shall be controlled, and, insofar as possible, eliminated on facility grounds and among offender populations.

    Therefore, it is the Secretary's policy that frequent unannounced and irregularly timed searches of offenders, their living quarters and other areas to which they have access, shall be conducted as often as necessary to ensure safety and security.  Searches shall be conducted in a professional manner that avoids unnecessary force and minimizes indignity to the offender while still accomplishing the objective of the search.  Only staff trained in effective search techniques shall conduct searches.

Department Regulation No. C-02-003
12 November 2008
Page Two

6.    DEFINITIONS:

    A.    DPS&C Facility:   Includes, for the purpose of this regulation, state
          operated prison facilities, Winn Correctional Center, Allen Correctional
          Center and all work release programs under contract to or under
          cooperative endeavor agreement with the Department of Public Safety
          and Corrections.

    B     He/His: Pronouns which include both male and female unless specifically
          stated otherwise.

    C.    Health Care Personnel:   Individuals whose primary duty is to provide
          health services to offenders in keeping with their respective levels of
          health care training, experience and authority.

    D.    Offender:  Anyone in the physical custody of the Department of Public
          Safety and Corrections or under the supervision of the Division of
          Probation and Parole.

    E.    Personal Searches

          1)    Property Search:  A search of any and all of an offender's property
                including, but not limited to, clothing, lockers, cells, rooms, beds,
                laundry bags, assigned work equipment and work areas.

          2)    Pat-Down Search (Also Frisk Search): A search of a fully clothed
                offender for the purpose of discovering contraband.   Pat-down
                searches may be conducted by an officer of the opposite gender
                than the offender and may be performed in any area of the facility
                and during movement periods.

                Exception:  At the Louisiana Correctional Institute for Women, pat-
                down searches shall be conducted only by female officers.  During
                emergency situations, this policy may be waived at the discretion of
                the Warden or designee.

                The offender being searched may be required to empty his pockets
                or any other item in his control where contraband (as defined in
                Department Regulation No. B-05-001 "Disciplinary Rules and
                Procedures for Adult Offenders") may be stored or carried.

                The offender being searched may also be required to remove all
                outerwear (coats, jackets, hats, caps, belts, gloves, shoes, socks,
                etc.) in order for these items to be searched.  He may also be
                required to run his hands through his hair and to open his mouth for

Department Regulation No. C-02-003
12 November 2008
Page Three

inspection. The offender will not be required to remove articles of clothing, which are the offender's basic dress (shirt, pants, dress, skirt, etc.)

The person conducting the search shall use his hands to touch the offender being searched, through his clothes, in such a manner to determine if something is being concealed. If the person conducting the search discovers an unusual lump, bulge, etc., he may order the offender being searched to disclose the source.

3)      General Search: A routine search of one or more individual offenders or a large group of offenders, such as an entire tier or dormitory. Both person and property may be searched.

During a general search, offenders may be required to remove their clothing down to their underwear (shorts for male offenders and camisole or bra and panties for female offenders) in order that the clothing may be inspected for contraband and the offender's person be visually observed. This may take place en masse, in the presence of other offenders. Offenders who claim that they are not wearing underwear will still be required to remove their basic dress.

4)      Strip Search: A visual search of an offender's nude body, conducted by employees of the same sex as the offender. Strip searches shall be conducted in a private place out of the view of others. The offender being searched may be required to bend over, squat, turn around, raise his arms and lift the genitals. (The foregoing list is typical, not exclusive.) The clothing of the offender being searched shall be thoroughly inspected prior to returning it. Strip searches shall be conducted in a respectful and dignified manner.

5)      Visual Body Cavity Search (Strip Search/Genital Examination): A search having the characteristics of a strip search with the addition of a visual search of the anal and/or vaginal openings, whereby the offender being searched is required to open the cheeks of the buttocks and/or the lips of the vagina. The offender's clothing shall also be thoroughly inspected prior to returning it. Such searches shall be conducted by officers of the same sex as the offender, in private and based on reasonable suspicion that the offender is carrying contraband or other prohibited material. (Reasonable suspicion is not required when offenders return from contact with the general public or from outside the facility.)

Department Regulation No. C-02-003
12 November 2008
Page Four

      6)    Body Cavity Search:  A search of an offender's body cavities conducted by trained health care personnel only.

    F.    Probable Cause:  Articulable factors supported by reasonable suspicion that contraband is being concealed.  Probable cause exists when facts and circumstances within the officer's knowledge and about which he has trustworthy information are sufficient to support a reasonable suspicion that an offense has been or will be committed and that contraband may be found at the place to be searched or on the offender.

    G.    Reasonable Suspicion:  Suspicion supported by facts and circumstances which lead an employee of ordinary caution to believe that an offender is concealing contraband in or on his body.  Factors to consider in determining reasonable suspicion include, but are not limited to, the following:

        1)    Nature of the tip or information;
        2)    Reliability of the informant;
        3)    Degree of corroboration of the tip or other information; or
        4)    Other facts contributing to suspicion.

    H.    Unit Head:  Wardens and Directors of DPS&C facilities and the Director of Probation and Parole.

7.    **WHEN SEARCHES ARE PERMITTTED:**

    A.    Property Search: May be conducted at any time.

    B.    Pat-down Search:  May be conducted at any time.

    C.    General Search:  May be conducted at any time.

    D.    Strip Search:  Upon approval by a Captain or higher-ranking employee in the chain of command, a routine strip search may be conducted by employees of the same sex as the offender at any time, without the requirement of reasonable suspicion or probable cause.

    Strip searches shall be conducted by one officer and witnessed by one additional officer or staff member of the same sex.

    The employees conducting the search shall document strip searches in the post or shift log.  Documentation should indicate the circumstances giving rise to the search (routine or other) and the results of the search.

Department Regulation No. C-02-003
12 November 2008
Page Five

Further documentation shall be governed by the requirements of Department Regulation No. C-05-001 "Activity Reports/Unusual Occurrence Reports/Operational Units."

E.   Visual Body Cavity Search:   A visual body cavity search may be conducted ROUTINELY, without a showing of reasonable suspicion and special documentation, under the following circumstances:

1)   When an offender is entering or leaving the facility for a court appearance, trip or work detail;

2)   After the offender participated in any physical contact visit;

3)   When an offender is entering or leaving a segregation area;

4)   After unescorted contact with general population offenders by an offender in segregation status;

5)   Otherwise, a visual body cavity search may be conducted only upon a specific and particular showing of reasonable suspicion towards that offender in accordance with the following procedures:

a.   Prior written approval of the Warden or designee;
b.   The search shall be conducted by one officer and witnessed by one additional officer or staff member of the same sex as the offender;
c.   The employees conducting the search shall document the visual body cavity search in the post or shift log. Documentation shall indicate the specific and particular showing of reasonable suspicion which gave rise to the search and the results of the search;
d.   Further documentation shall be governed by the requirements of Department Regulation No. C-05-001 "Activity Reports/Unusual Occurrence Reports/ Operational Units."

F.   Body Cavity Search:   A body cavity search is permitted only under the following circumstances:

1)   When a visual body cavity search creates specific and particular showing of reasonable suspicion that the offender is concealing something within a body cavity. (For example, if the area is reddened, if a substance such as vaseline is smeared outside the opening or if something is bulging or protruding from the cavity);

Department Regulation No. C-02-003
12 November 2008
Page Six

2)  Trained health care personnel only shall conduct a body cavity search and perform any necessary extraction. The offender must be searched in a sanitary manner and in a sanitary location in accordance with standard medical practice. Such search shall be conducted only upon prior written approval of the Warden or designee;

3)  The search shall be witnessed by two staff members of the same sex as the offender;

4)  Health care personnel who conducted the search and the staff members who witnessed the search shall document the body cavity search in the post, shift and/or medical log. Documentation shall indicate the specific and particular showing of reasonable suspicion that the offender was concealing something within a body cavity which gave rise to the search and the results of the search;

5)  Further documentation shall be governed by the requirements of Department Regulation No. C-05-001 "Activity Reports/ Unusual Occurrence Reports/Operational Units."

8.  **SEARCHES BY DRUG-SNIFFING DOGS:** Searches of an offender's property by trained drug-sniffing dogs may be conducted at any time.

9.  **DISPOSITION OF CONTRABAND:** Contraband or unauthorized property (as defined in Department Regulation No. B-05-001 "Disciplinary Rules and Procedures for Adult Offenders") found during a search shall be disposed of in accordance with Department Regulation No. C-03-007 "Offender Personal Property List, State Issued Items, Procedures for the Reception, Transfer and Disposal of Offender Personal Belongings."

s/James M. Le Blanc
Secretary

This regulation supersedes Department Regulation No. C-02-003 dated 15 December 15 1992.



BOBBY JINDAL
Governor
Secretary

JAMES M. Le BLA

# State of Louisiana
Department of Public Safety and Corrections
Louisiana State Penitentiary

## STATE OF LOUISIANA
## WEST FELICIANA PARISH
## ANGOLA, LOUISIANA

I hereby certify that the attached documents are TRUE AND CORRECT

COPIES of the original documents maintained at the Louisiana State

Penitentiary.

Camp C Tiger Units Shower Roster Tiger 1 & 2, Tiger 3 & 4

Dated for 8/21/2011

Connie McCann #77912
Ex-Officio Notary
Department of Public Safety & Corrections/LSP

Date: 11 | 19 | 12



Raymond Fobbs vs. Daniel Davis

Louisiana State Penitentiary • Angola, Louisiana 70712-9813 • (225) 655-4411 • Fax (225) 655-2319
www.doc.la.gov
An Equal Opportunity Employer

# CAMP C UNIT SHOWER ROSTER

Case 3:11-cv-00700-JWD-SCR   Document 66-8   12/19/12   Page 71 of 82

| UNIT | TIGER | One Left & Right | | DATE August 21th, 2011 |
|---|---|---|---|---|

| W | Cell # | Left Tier | | Yards | | Showers | | Tier Hour | | Razor Y/N | Notes on Delays, Special Information, House Arrest, Cell Confinement |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OFFENDERS NAME | Number | On | Off | In | Out | On | Off | N/A | |
| W | 02 | James Davis | | Complete | | 7:00 | 7:15 | 7:00 | 7:30 | N/A | by Request |
| B | 03 | Calvin Alfred | | complete | | 8:50 | 8:15 | 7:33 | 8:55 | N/A | |
| B | 04 | Emanuel Jyles   SS | | complete | | 7:15/A | 7:34 | 7:45/A | 8:15/A | N/A | |
| B | 05 | Lovell Johnson | | complete | | 8:30/A | 8:55/A | 8:17/A | 9:17/A | N/A | |
| B | 06 | Kenneth Smith | | complete | refused | | 9:14/A | 9:39/A | N/A | by request | |
| B | 07 | Gary Gant | | complete | | 9:30/A | 9:45/A | 9:59/A | 10:30/A | N/A | chow |
| B | 08 | Damond Caliste | | complete | | 11:55/A | 12:10/p | 11:10/p | 12:30/p | N/A | |
| B | 09 | George Branch | | complete | refused | | 12:15/p | 12:30/p | N/A | by request | |
| B | 10 | Jeffery Maggio | | complete | | 12:34 | 12:44 | 1:24/p | 1:35/p | N/A | shs ting down |
| W | 11 | Adam Billiot | | complete | | 1:55/p | 2:10/p | 1:55/p | 2:55/p | N/A | |
| W | 12 | Frank Arceneaux   SS | | complete | | 4:10/p | 4:45/p | 3:00/p | 4:45/p | N/A | chow time 30 min |
| B | 13 | Billy Jackson | | complete | | 5:32 | 5:45 | 5:32 | 5:45 | N/A | by Request |
| B | 14 | Michael Celestine | | complete | | 6:00/p | 6:15/p | 5:42/p | 6:12/p | N/A | |

| B W | Cell # | Right Tier Administrative Segregation | | Yards | | Showers | | Tier Hour | | Razor Y/N | Notes on Delays, Special Information, House Arrest, Cell Confinement |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OFFENDERS NAME | Number | On | Off | In | Out | On | Off | N/A | |
| W | 02 | Arthur Parker | | Security Risk | | 8:15 | 9:30 | Security Risk | | N/A | |
| B | 03 | David Honore | | Security Risk | | 8:00 | 6:15 | Security Risk | | N/A | |
| B | 04 | Troy Abron | | Security Risk | | 7:45 | 8:00 | Security Risk | | N/A | |
| W | 05 | Gary Matthews | | Security Risk | | 4:30 | 4:43 | Security Risk | | N/A | |
| B | 06 | Ellis Thompson | | Security Risk | | 7:00 | 7:00 | Security Risk | | N/A | |
| B | 07 | Jermaine Foster | | Security Risk | | 6:43 | 7:00 | Security Risk | | N/A | |
| | 08 | | | Security Risk | | | | Security Risk | | N/A | |
| | 09 | | | Security Risk | | | | Security Risk | | N/A | |
| | 10 | | | Security Risk | | | | Security Risk | | N/A | |
| B | 11 | Darren Jarvis | | Security Risk | | 6:30 | 6:43 | Security Risk | | N/A | |
| B | 12 | Raymond Washington | | Security Risk | | 6:00 | 6:30 | Security Risk | | N/A | |
| | 13 | | | Security Risk | | | | Security Risk | | N/A | |
| B | 14 | David Cary   SS | | Security Risk | | 6:30 | 6:32 | Security Risk | | N/A | |

| Day Shift Officer | Sgt. J. Frank. | Night Shift Officer | Sgt. Bria Smith | Time Shower Started | 7:15/A | Time Shower Stopped | |
|---|---|---|---|---|---|---|---|

# CAMP C UNIT SHOWER ROSTER

| UNIT | TIGER | Two Left & Right | | | | | | DATE: August 21th, 2011 | | |
|------|-------|------------------|---|---|---|---|---|---|---|---|

| B W | Cell # | Left Tier | | YARDS | | SHOWERS | | TIER HOUR | | Razor Y/N | Notes on Delays, Special Information, House Arrest, Cell Confinement |
|-----|--------|-----------|---|-------|-----|---------|-----|-----------|-----|-----------|----------------------------------------------|
| | | OFFENDERS NAME | Number | On | Off | In | Out | On | Off | N/A | |
| W | 02 | Raymond Shaw   55 | | Caught | | 7:15 | 7:3 | 7:00 | 7:30 | N/A | |
| B | 03 | Leo Mitchell | | Caught | | 8:15 | 9:0 | 7:30 | 8:30 | N/A | |
| W | 04 | Timothy Murray | | Caught | | 9:30 | 9:45 | 8:30 | 9:45 | N/A | |
| W | 05 | James Ormond | | Caught | | 10:20 | 10:35 | 9:45 | 10:35 | N/A | |
| B | 06 | Michael Rice | | Caught | | 12:50 | 1:00 | 12:05 | 1:00 | N/A | |
| B | 07 | Larry Williams | | Caught | | :50 | 2:05 | 1:00 | 2:05 | N/A | |
| " | 08 | Barry Sadler | | Caught | | 2:50 | 3:00 | 2:05 | 3:00 | N/A | |
| ~ | 09 | Reginald Williams | | Caught | | 6:15 | 6:30 | 5:30 | 6:15 | N/A | |
| B | 10 | Edward Patterson | | Caught | | 7:15 | 7:30 | 6:15 | 7:15 | N/A | |
| B | 11 | James Koon | | Caught | | 7:30 | 9:45 | 7:15 | 8:30 | N/A | |
| B | 12 | Oliver Green | | Caught | | Refused | | 8:30 | 9:00 | N/A | In by request |
| B | 13 | Travis Shelving | | Caught | | 9:45 | 10:00 | 9:00 | 9:45 | N/A | |
| B | 14 | Emile Grant | | Caught | | 10:00 | 10:15 | 10:15 | 11:00 | N/A | |

| B W | Cell # | Right Tier | | YARDS | | SHOWERS | | TIER HOUR | | Razor Y/N | Notes on Delays, Special Information, House Arrest, Cell Confinement |
|-----|--------|-----------|---|-------|-----|---------|-----|-----------|-----|-----------|----------------------------------------------|
| | | OFFENDERS NAME | Number | On | Off | In | Out | On | Off | N/A | |
| B | 02 | Larry Davis | | Caught | | 7:35 | 7:05 | 7:47 | 8:30 | N/A | |
| B | 03 | Cedric Hutton | | Caught | | 8:00 | 9:0 | 8:35 | 9:15 | N/A | |
| B | 04 | Bryan Alexander | | Caught | | 9:30 | 9:45 | 9:45 | 10:00 | N/A | In by request |
| ~ | 05 | Kevin Carter | | Caught | | 2:30 | 2:42 | 7:30 | 7:42 | N/A | |
| B | 06 | Darren Simpson | | Caught | | 8:00 | 8:42 | 7:42 | 8:42 | N/A | |
| B | 07 | Ronnie Roy | | Caught | | 9:30 | 9:45 | 8:47 | 9:45 | N/A | |
| B | 08 | Markeece Mosley | | Caught | | 10:30 | 10:35 | 9:45 | 10:35 | N/A | |
| W | 09 | Charles Allen | | Caught | | 11:45 | 12:05 | 11:05 | 12:05 | N/A | |
| B | 10 | James Brown | | Caught | | 12:00 | 12:25 | 12:05 | 12:25 | N/A | |
| B | 11 | Ronald Brooks | | Caught | | 12:38 | 12:44 | 12:25 | 1:00 | N/A | |
| B | 12 | Quentrell Kelson | | Caught | | 2:50 | 3:00 | 2:05 | 3:00 | N/A | |
| B | 13 | Lloyd Richard | | Caught | | 6:15 | 6:30 | 5:30 | 6:15 | N/A | |
| B | 14 | Kia Stewart | | Caught | | 9:15 | 7:30 | 6:30 | 7:15 | N/A | |

| Day Shift Officer | | Night Shift Officer | | Time Shower Started | 7:00p | Time Shower Stopped | 11:00 |
|-------------------|---|---------------------|---|---------------------|-------|---------------------|-------|

Case 3:11-cv-00700-JWD-SCR    Document 66-8    12/19/12    Page 72 of 82

# C & D Team – Tiger 3 Left – Shower Roster

## Date: August 21ᵗʰ, 2011

| Cell # | DOC # | Offender's Name | Time Out | Time In | Comments |
|--------|-------|-----------------|----------|---------|----------|
| 02 | | Elrick Foret | 7:05 | 7:20 | N YHc |
| | | William Lauga | 7:05 | 7:20 | |
| 03 | | Steven Stovall | 7:25 | 7:40 | |
| | | Patrick Brown | 7:25 | 7:40 | |
| 04 | | Bruce Thomas | 7:45 | 8:00 | |
| | | Eric Dunn | 7:45 | 8:00 | |
| 05 | | Paul Martinez | 8:05 | 8:20 | |
| | | Larry Williams | 8:05 | 8:20 | |
| 06 | | Eddie Lane | 5:40 | 5:55 | |
| | | Keith Scott | 5:40 | 5:55 | |
| 07 | | Eldin George | 8:25 | 8:40 | |
| | | William Chapman | 8:25 | 8:40 | |
| 08 | | Benjamin Bell | 5:55 | 6:10 | |
| | | Michael Washington | 8:45 | 9:00 | |
| 09 | | Ennis Thomas | ADr | Sc | Adm. Seg |
| | | Rodney Washington | 6:10 | 6:25 | |
| 10 | | Keyon Walker | 9:05 | 9:20 | |
| | | Abram Banks | 9:05 | 9:20 | |
| 11 | | Eddie Lambert | 9:25 | 9:40 | |
| | | Richard Burnham | 9:25 | 9:40 | |
| 12 | | Joe Wyatt | 9:45 | 10:00 | |
| | | Derrick Robbins | 9:45 | 10:00 | |
| 13 | | Micheal Gaddis | 10:05 | 10:20 | |
| | | Fair Bryant | 10:05 | 10:20 | |
| 14 | | Adam Freeman | 6:25 | 6:40 | |
| | | Vernon Callier | 6:25 | 6:40 | N YHc |

Comments: N DHc

_____

_____

DAY SHIFT OFFICER'S NAME          NIGHT SHIFT OFFICER'S SIGNATURE



## C & D Team – Tiger 3 Right – Shower Roster

### August 21th, 2011

| Cell # | DOC # | Offender's Name | Time Out | Time In | Comments |
|--------|-------|-----------------|----------|---------|----------|
| 02 | | Claude Johnson | 11:10 | 11:25 | NUHC |
| | | Lidio Calzadilla | 11:10 | 11:25 | |
| 03 | | Linton Jones | 10:50 | 11:05 | |
| | | Cedrick Richardson | 10:50 | 11:05 | |
| 04 | | Jamal Tucker | 10:30 | 10:45 | |
| | | Jeremy Patterson | 10:30 | 10:45 | |
| 05 | | Donald Harris | 10:10 | 10:25 | |
| | | Darren McKinney | 10:10 | 10:25 | |
| 06 | | Kevin Walker | 9:50 | 10:05 | |
| | | Jamall Chapman | 9:50 | 10:05 | |
| 07 | | Jonathan Johnson | 9:30 | 9:45 | |
| | | Melvin Johnson | 9:30 | 9:45 | |
| 08 | | Jeffery Miller | 9:30 | 9:45 | |
| | | Troy Valentine | 9:10 | 9:25 | |
| 09 | | William Fallen | 8:50 | 9:05 | |
| | | Ricky Gary | 8:15 | 8:30 | |
| 10 | | Terrance Gillian | 8:30 | 8:45 | |
| | | Tamarcus Davis | 8:30 | 8:45 | |
| 11 | | Torrance Harmon | 8:00 | 8:15 | |
| | | Austin Dyers | 8:10 | 8:25 | |
| 12 | | Paul Ware | 7:50 | 8:05 | |
| | | James Hebert | 7:50 | 8:05 | |
| 13 | | Alvin Bratton | 5:45 | 6:00 | |
| | | Edward Simmons | 7:30 | 7:45 | |
| 14 | | Desmond Kirby | 7:10 | 7:25 | |
| | | James Evans | 7:10 | 7:25 | N YWC |

Comments: N YW

_____     _____
DAY SHIFT OFFICER'S NAME         NIGHT SHIFT OFFICER'S SIGNATURE



## C & D Team – Tiger 4 Left – Shower Roster

Date: August 21ᵗʰ, 2011

| Cell # | DOC # | Offender's Name | Time Out | Time In | Comments |
|---|---|---|---|---|---|
| 02 | | Coy Simpson | 610p | 625p | |
| | | Troy Abron | Adm | scc | Adm. Seg |
| 03 | | Kevin Burdis | 550p | 605p | |
| | | Don Wisinger | 550p | 600p | |
| 04 | | Andre Evans | 630p | 645p | |
| | | Carey Hood | 630p | 645p | |
| 05 | | Clifton Fielding | 650p | 705p | |
| | | Gabriel Logan | 650p | 705p | |
| 06 | | Anthony Jackson | 710p | 725p | |
| | | Jeffery Engrum | 710p | 725p | |
| 07 | | Troy Grimes | 610p | 625p | |
| | | Kevin King | 610p | 625p | |
| 08 | | Roy Walker | 530 | 545 | |
| | | Phillip Barnes | 530 | 545 | |
| 09 | | Terrance Simon | 730p | 745p | |
| | | Steven Burdis | 730p | 745p | |
| 10 | | Vonnie Todd | 750p | 805p | |
| | | David Thompson | 750p | 805p | |
| 11 | | Thomas Critton | 810p | 825p | |
| | | Arthur Spikes | 810p | 825p | |
| 12 | | Kevin Thames | 830pm | 845pm | |
| | | Barry Woods | 830pm | 845pm | |
| 13 | | Anthony Drummer | 850pm | 905pm | |
| | | Jordan Davier | 850pm | 905pm | |
| 14 | | Ronald Williams | 910pm | 925pm | |
| | | Lezric Morris | 910pm | 925pm | |

Comments: _____

_____

_____

DAY SHIFT OFFICER'S NAME        NIGHT SHIFT OFFICER'S SIGNATURE



## C & D Team – Tiger 4 Right – Shower Roster

### Date: August 21ᵗʰ, 2011

| Cell # | DOC# | Offender's Name | Time Out | Time In | Comments |
|---|---|---|---|---|---|
| 02 | | Perry Curry | 535p | 550M | |
| | | Derrick Clay | 535p | 550pM | |
| 03 | | Jamal Walker | 400 | 630pM | |
| | | Corey Smith | 800 | 630M | |
| 04 | | Thomas Humphries | 640p | 655pM | |
| | | Charles Jones | 640p | 655M | |
| 05 | | James Bishop | 700p | 715pM | |
| | | Ronald Williams | 700p | 750M | |
| 06 | | Warren Dickerson | 720p | 735pM | |
| | | Carl Ruffins | 720p | 735pM | |
| 07 | | Lloyd Bobo | 740p | 755pM | |
| | | Durrell Smith | 740p | 755pM | |
| 08 | | Christopher Johnson | 800p | 850M | |
| | | Francis Brown | 800p | 850pM | |
| 09 | | Michael Dye | 555p | 610pM | |
| | | Quincy Brown | 555p | 610pM | |
| 10 | | Raymond Fobbs | 8pm | 8cm | |
| | | Daniel Carter | 820pM | 835pM | |
| 11 | | Robert Bindon | 820pM | 835pM | |
| | | Herbert Walker | 840pM | 855pM | |
| 12 | | Herbert Perkins | 840pM | 855pM | |
| | | Leroy Grippen | 900pM | 915pM | |
| 13 | | Kevin Narcisse | 900pM | 935pM | |
| | | Darryl Roshell | 920pM | 900pM | |
| 14 | | Charles Mizell | 940pM | 955pM | |
| | | Leslie Collins | 941pM | 955pM | |

Comments: _____

_____

_____

DAY SHIFT OFFICER'S NAME         NIGHT SHIFT OFFICER'S SIGNATURE



# 8-21-11 TIGER UNIT INMATES' CURREN LOCATION SHEET
## (Inmates' Current Locations Are Indicated Hereinbelow

| INMATE'S NAME | LOCATION | | INMATE'S NAME | LOCATION | |
|---|---|---|---|---|---|
| James Davis | LSP Walnut 4 | | Raymond Shaw | LSP Hickory 4 | |
| Clavin Alfred | DCI | | Leo Mitchell | LSP Camp J SK 2/R | |
| Emanuel Jyles | LSP Camp C Jag 1/R | | Timothy Murray | LSP Hickory 1 | |
| Lovell Johnson | RELEASED | | James Ormond | LSP Camp C Tiger 2/L | |
| Kenneth Smith | LSP Camp C Jag 1/R | | Michael Rice | LSP Camp D Hawk 2/L | |
| Gary Grant | LSP Camp C Jag 1/R | | Kevin Carter | LSP T.U. Lower F | |
| Damond Caliste | LSP Camp D Falcon 4 | | Barry Sadler | LSP Tiger 3/R | |
| George Branch | LSP T.U. Lower B | | Reginald Williams | LSP CBA U/L | |
| Jeffery Maggio | LSP CBC U/L | | Edward Patterson | LSP Camp C Jag 1/L | |
| Adam Billiot | LSP Camp D Falcon 1 | | James Koon | LSP Camp C Tiger 3/L | |
| Frank Arceneaux | LSP Camp D Raven 4/R | | Oliver Green | LSP CBC U/L | |
| Billy Jackson | DECEASED | | Travis Shelving | LSP Camp J SK 3/R | |
| Michael Celestine | LSP Hickory 1 | | Emile Grant | LSP Pine 3 | |
| Arthur Parker | LSP Camp C Jag 1/L | | Claude Johnson | LSP Camp C 3/L | |
| David Honore | LSP Camp D Eagle 2 | | Lidio Calzdilla | LSP Camp C Tiger 3/R | |
| Troy Abron | LSP Camp J Gar 3?L | | Linton Jones | LSP Camp D Raven 1/L | |
| Gary Matthews | LSP Camp C Gar 2/R | | Cedrick Richardson | LSP Walnut 3 | |
| Ennis Thompson | LSP Pine 2 | | Jamal Tucker | LSP Hickory 1 | |
| Jermaine Foster | LSP CBB 2/R | | Jeremy Patterson | LSP Camp D Raven 1/R | |

11/27/2012

11:25 AM


STATE'S EXHIBIT

1

# 8-21-11 TIGER UNIT INMATES' CURREN LOCATION SHEET
## (Inmates' Current Locations Are Indicated Hereinbelow

Case 3:11-cv-00700-JWD-SCR   Document 66-8   12/19/12   Page 78 of 82

| INMATE'S NAME | LOCATION | | INMATE'S NAME | LOCATION | |
|---|---|---|---|---|---|
| James Davis | LSP Walnut 4 | | Raymond Shaw | LSP Hickory 4 | |
| Darren Jarvis | LSP Walnut 1 | | Donald Harris | LSP CBB L/R | |
| Laymon Washington | HCC | | Darren McKinney | LSP CBC L/R | |
| David Carey | LSP Camp J SK 1/L | | Kevin Walker | LSP Spruce 1 | |
| Elrick Foret | LSP Pine 1 | | Jamall Chapman | LSP Walnut 1 | |
| William Lauga | LSP Spruce 1 | | Jonathan Johnson | LSP CBC U/L | |
| Stevn Stovall | LSP Camp C Jag 2/L | | Melvin Johnson | LSP Camp C Tiger 3/R | |
| Patrick Brown | LSP Camp D Falcon 1 | | Jeffery Miller | LSP Pine 2 | |
| Bruce Thomas | LSP Pine 1 | | Troy Valentine | LSP Magnolia 1 | |
| Eric Dunn | LSP Walnut 1 | | William Fallen | LSP Camp D Raven 3/R | |
| Paul Martiniez | LSP CBC U/L | | Ricky Gary | LSP Camp D Eagle1 | |
| Larry Williams | LSP Camp D Falcon 1 | | Terrance Gillian | LSP Pine 2 | |
| Eddie Lane | LSP Camp D Raven 3/R | | Tamarcus Davis | LSP Camp C Tiger 3/R | |
| Keith Scott | LSP CBC U/L | | Torrance Harmon | LSP Camp D Falcon 1 | |
| Eldin George | DCI | | Austin Dyers | LSP Walnut 3 | |
| William Chapman | LSP CBA L/L | | Paul Ware | LSP Spruce 1 | |
| Benjamin Bell | LSP Eagle 1 | | Darren Simpson | LSP Pine 4 | |
| Michael Washington | LSP Walnut 4 | | Alvin Bratton | LSP Camp J Gar 4/L | |
| Keyon Walker | RCC | | Edawrd Simmons | LSP Camp J Gator 4/R | |
| Abram Banks | LSP Camp D Falcon 2 | | Desmond Kirby | HCC | |

11/27/2012

11:25 AM

# 8-21-11 TIGER UNIT INMATES' CURREN LOCATION SHEET
## (Inmates' Current Locations Are Indicated Hereinbelow

Case 3:11-cv-00700-JWD-SCR   Document 66-8   12/19/12   Page 79 of 82

| INMATE'S NAME | LOCATION | | INMATE'S NAME | LOCATION | |
|---|---|---|---|---|---|
| James Davis | LSP Walnut 4 | | Raymond Shaw | LSP Hickory 4 | |
| Eddie Lambert | LSP Pine 3 | | James Evans | LSP Camp D Falcon 4 | |
| Richard Burnham | LSP Pine 4 | | Markeece Mosley | LSP Camp D Falcon 2 | |
| Joe Wyatt | LSP CBA U/L | | Charles Allen | LSP Camp D Raven 3/L | |
| Derrick Robbins | LSP Camp D Raven 3/R | | James Brown | LSP Camp D Falcon 3 | |
| Michael Gaddis | LSP Camp D Falcon 4 | | Ronald Brooks | LSP Camp J Cuda 1/L | |
| Fair Bryant | LSP Walnut 3 | | Quentrell Kelson | LSP T.U. Lower F | |
| Adam Freeman | LSP Camp C Tiger 3/L | | Lloyd Richard | LSP T.U. Upper B | |
| Vernon Callier | LSP Oak 1 | | Kia Stewart | LSP Camp J Gator 3/L | |
| Kevin Burdis | LSP CBC U/L | | Ronald Williams | LSP Pine 1 | |
| Don Wisinger | LSP Camp D Raven 4/L | | Ennis Thomas | LSP Pine 2 | |
| Andre Evans | LSP CBA U/R | | Rodney Washington | LSP Pine 1 | |
| Carey Hood | LSP Camp J Gar 4/R | | Keyon Walker | RCC | |
| Clifton Fielding | LSP Camp C Tiger 4/L | | Abram Banks | LSP Camp D Falcon 2 | |
| Gabriel Logan | LSP Camp C 4/L | | Eddie Lambert | LSP Pine 3 | |
| Anthony Jackson | DCI | | Richard Burnham | LSP Pine 4 | |
| Jeffery Engrum | LSP Camp J Shark 1/R | | Joe Wyatt | LSP CBA U/L | |
| Troy Grimes | LSP Hickory 2 | | Anthony Drummer | LSP Camp C Tiger 4/L | |
| Kevin King | LSP Hickory 4 | | Perry Curry | LSP Camp C Tiger r/R | |
| Roy Walker | LSP CBC U/R | | Derrick Clay | LSP Camp C Tiger 4/R | |

11/27/2012

11:25 AM

3

# 8-21-11 TIGER UNIT INMATES' CURREN LOCATION SHEET
## (Inmates' Current Locations Are Indicated Hereinbelow

| INMATE'S NAME | LOCATION | | INMATE'S NAME | LOCATION | |
|---|---|---|---|---|---|
| James Davis | LSP Walnut 4 | | Raymond Shaw | LSP Hickory 4 | |
| Phillip Barnes | LSP Camp D Falcon 1 | | Bryan Alexander | LSP Camp C Jag 1/L | |
| Ronnie Roy | LSP CBA 1/L | | Larry Davis | LSP Camp D Raven 4/L | |
| Terrance Simon | LSP CBA L/L | | Cedric Hutton | LSP C Tiger 4/R | |
| Vonnie Todd | LSP Camp D Falcon 1 | | Arthur Spike | LSP T.U. L/E | |
| David Thompson | LSP Camp D Raven 1/L | | Kevin Thames | LSP Spruce 3 | |
| Lezric Morris | LSP Camp D Falcon 2 | | Barry Woods | LSP C Tiger 4/L | |
| Derrick Robbins | Camp D Raven 3/R | | Michael Gaddis | Camp D Falcon 4 | |
| Fair Bryant | Walnut 3 | | Adam Freeman | Camp C Tiger 3/L | |
| Vernon Callier | LSP Oak 1 | | Claude Johnson | LSP Camp C Tiger 3/L | |
| Coy Simpson | LSP Spruce 4 | | Troy Abron | LSP Camp J Gar 3/L | |
| Kevin Burdis | LSP CBC U/L | | Don Wisinger | LSP Camp D Raven 4/L | |
| Andre Evans | LSP CBA U/R | | Carey Hood | LSP Camp J Gar 4/R | |
| Clifton Fielding | LSP Camp C Tiger 4/L | | Anthony Jackson | DCI | |
| Jeffery Engrum | LSP Camp J Shark 1/R | | Troy Grimes | LSP Hickory 2 | |
| Kevin King | LSP Hickory 4 | | Roy Walker | LSP CBC U/R | |
| Phillip Barnes | LSP Camp D Falcon 1 | | Steven Burdis | LSP Camp D Falcon 1 | |
| Vonnie Todd | LSP Camp D Falcon 1 | | David Thompson | LSP Camp D Raven 1/L | |
| Arthur Spikes | LSP T.U. L/E | | Kevin Thames | LSP Spruce 3 | |
| Barry Woods | LSP Camp C Tiger 4/L | | Anthony Drummer | LSP Camp C Tiger 4/L | |

Case 3:11-cv-00700-JWD-SCR    Document 66-8    12/19/12    Page 80 of 82

# 8-21-11 TIGER UNIT INMATES' CURREN LOCATION SHEET
## (Inmates' Current Locations Are Indicated Hereinbelow

| INMATE'S NAME | LOCATION | | INMATE'S NAME | LOCATION | |
|---|---|---|---|---|---|
| James Davis | LSP Walnut 4 | | Raymond Shaw | LSP Hickory 4 | |
| Jordan Damian | LSP Walnut 4 | | Jamal Walker | LSP Camp C Tiger 4/L | |
| Corey Smith | LSP CBC U/L | | Thomas Humphries | LSP Camp D Eagle 2 | |
| Charles Jones | LSP Hickory 3 | | Ronald Williams | LSP Camp C Tiger 4/R | |
| Warren Dickerson | LSP Camp J Gar 1/L | | Carl Ruffins | LSP Camp C Tiger 2/R | |
| Lloyd Bobo | LSP Camp D Falcon 2 | | Darrell Smith | LSP CBB L/L | |
| Christopher Johnson | LSP Walnut 4 | | Francis Brown | LSP Pine 1 | |
| Michael Dye | LSP CBA U/L | | Quincy Brown | LSP Camp D Eagle 3 | |
| Raymond Fobbs | RCC | | Daniel Carter | LSP Walnut 3 | |
| Robert Bindon | LSP Pine 4 | | Herbert Walker | LSP Camp J Cuda 2/L | |
| Herbert Perkins | LSP Camp D Falcon 2 | | Leroy Grippen | LSP Camp C Tiger 4/R | |
| Kevin Narcisse | LSP Walnut 4 | | Darrly Roshell | LSP Camp J Gator 4/R | |
| Charles Mizell | LSP Camp D Raven 3/L | | | | |
| | | | | | |
| Larry Williams | LSP Camp D Falcon 1 | | James Hebert | LSP Main Prison West Pine 2 | |
| Thomas Critton | David Wade Correctional Center | | Davier Jordan | LSP Walnut 4 Main Prison West | |
| Leroy Grippen | LSP Camp C Tiger 4 Right | | Darryl Roshell | LSP Camp J Gar 4 Right | |
| **Leslie Collins** | All of the Inmates by that Name have been Released, | | Gabriel Logan | LSP Camp C Tiger 4 Left | |
| | Unable to Locate, Either Wrong DOC # or Wrong Name | | Herbert Perkins | LSP Camp D Falcon 2 | |
| | on Roster from 8-21-11 | | | | |

11/27/2012

11:25 AM

Case 3:11-cv-00700-JWD-SCR   Document 66-8   12/19/12   Page 81 of 82

# 8-21-11 TIGER UNIT INMATES' CURREN LOCATION SHEET
## (Inmates' Current Locations Are Indicated Hereinbelow

| INMATE'S NAME | LOCATION | | INMATE'S NAME | LOCATION | |
|---|---|---|---|---|---|
| James Davis | LSP Walnut 4 | | Raymond Shaw | LSP Hickory 4 | |
| James Bishop | Names of 4 Inmates by that Name Appear in Cajun | | | | |
| | According to Cajun all 4 Inmates Have Been Released | | | | |
| | Unable to Locate | | | | |
| | Either Wrong Name or Wrong DOC # | | | | |
| | on 8-21-11 Roster | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |